UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Eastern Division

## 05 10717 RGS 05-CV-

JANE C. EDMONDS, as she is Director of the
Commonwealth of Massachusetts Department of
Workforce Development,

                        Petitioner,

v.

ELAINE CHAO, as she is United States Secretary
of Labor, and UNITED STATES DEPARTMENT
OF LABOR,

                        Respondents.

JUDGE A\enun\w\

RECEIPT # _____
AMOUNT $ 250
SUMMONS ISSUED Y (5
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY CLK. _____
DATE 4-11-05

## PETITION FOR JUDICIAL REVIEW

### Introduction

In accordance with the Administrative Procedure Act and the Declaratory Judgment Act,

Jane C. Edmonds, as she is Director of the Commonwealth of Massachusetts Department of

Workforce Development, seeks judicial review of the March 11, 2005, Final Decision and Order

of the Administrative Review Board of the United States Department of Labor affirming the

disallowance of certain funds provided to the Commonwealth in connection with the now-

repealed Job Training Partnership Act of 1982 and ordering the Commonwealth to repay

$8,925,381. Because the Final Decision and Order is not in conformance with the law and is not

supported by substantial evidence, the Commonwealth respectfully requests that this Court issue

1) a declaration setting aside the decision; 2) an order directing the United States Department of

Labor to reduce the amount of disallowed costs from $8,925,381 to $1,829,646; and 3) an order

directing the United States Department of Labor to grant the Commonwealth a waiver of liability in accordance with 29 U.S.C. § 1574(e).

<div align="center">Allegations</div>

I.    Parties

    1.    Petitioner Jane C. Edmonds is the Director of the Department of Workforce Development, an agency of the Commonwealth of Massachusetts with a usual place of business at One Ashburton Place, Boston, Suffolk County, Massachusetts, 02108 ("Commonwealth"). Director Edmonds brings this action in her official capacity.

    2.    Respondent Elaine Chao is the United States Secretary of Labor ("Secretary") has a usual place of business at 200 Constitution Avenue, NW, Washington, D.C. 20201, and is named in her official capacity.

    3.    Respondent United States Department of Labor ("USDOL") has a usual place of business at 200 Constitution Avenue, NW, Washington, D.C. 20201, and a regional office at J.F.K. Federal Building, Boston, Suffolk County, Massachusetts, 02203.

II.    Cause of Action, Jurisdiction & Venue

    4.    This petition for judicial review of the March 11, 2005, USDOL Final Decision and Order is brought under the judicial-review provisions of the United States Administrative Procedure Act (5 U.S.C. §§ 701-706) and the United States Declaratory Judgment Act (28 U.S.C. § 2201).

    5.    This case is properly brought in this Court under 5 U.S.C. §§ 701-706 and 28 U.S.C. § 2201 because there is an actual controversy between the parties caused by the USDOL Final Decision and Order and because judicial review of the decision is otherwise unavailable.

<div align="center">2</div>

The statutory section that would have provided such review, 29 U.S.C. § 1578, was repealed effective July 1, 2000.

    6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

    7.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

III.    Factual Allegations Giving Rise to Petition

    8.     On March 11, 2005, the Administrative Review Board of the USDOL issued its Final Decision and Order in ALJ Case No. 98-JTP-6 (ARB Case No. 04-170), Commonwealth of Massachusetts v. United States Department of Labor ("USDOL decision"). A copy of this decision is attached hereto as Exhibit A.

    9.     The USDOL decision was received by the Commonwealth's Department of Workforce Development on March 14, 2005.

    10.    In its decision, the USDOL affirmed the disallowance of $8,925,381 in job-training funds that had been remitted to the Commonwealth under the Job Training Partnership Act, 29 U.S.C. §§ 1571-1583, which has since been repealed in its entirety. See Exhibit A.

    11.    In its decision, the USDOL found that the Commonwealth had received slightly over $9 million in funds which it, in turn, distributed to the Service Delivery Area for which the City of Lynn acted as the grant sub-recipient. The USDOL further found that the Commonwealth failed to maintain adequate financial controls over the funds, despite evidence presented by the Commonwealth concerning its imposition of such controls.

    12.    The USDOL further ordered the Commonwealth to pay it $8,925,381 in non-federal funds. See Exhibit A.

    13.    The Commonwealth does not dispute that $1,829,646 of that amount was properly

disallowed.

14.     The portion of the USDOL decision pertaining to the remaining disallowed funds ($7,095,735), however, is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) in excess of the USDOL's statutory authority; (c) unsupported by substantial evidence; (d) without observance of procedure required by law; and/or (e) unwarranted by the facts.

15.     The Commonwealth has suffered a legal wrong from the USDOL decision to the extent that it disallows funds in excess of $1,829,646.

16.     The USDOL decision has created an actual controversy between the parties to the extent that it disallows funds in excess of $1,829,646.

### Relief Requested

Based on the allegations made above, the Commonwealth respectfully requests that this Court:

A.     After a hearing on the merits, DECLARE that the USDOL decision is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) in excess of the USDOL's statutory authority; (c) unsupported by substantial evidence; (d) without observance of procedure required by law; and/or (e) unwarranted by the facts;

B.     ORDER that the USDOL decision be set aside;

C.     ORDER that the amount of disallowed costs be reduced to $1,829,646; and

D.     GRANT such further relief deemed just, including but not limited to WAIVING any liability of the Commonwealth to the USDOL above and beyond $1,829,646 in accordance with 29 U.S.C. § 1574(e).

4

Respectfully submitted,

JANE C. EDMONDS, as she is Director of the
Commonwealth of Massachusetts Department of
Workforce Development,

By her attorney,

THOMAS F. REILLY
ATTORNEY GENERAL


Juliana deHaan Rice, BBO 564918
Assistant Attorney General
Office of the Attorney General
One Ashburton Place - Room 2019
Boston, MA  02108
(617) 727-2200, ext. 2062


Robert K. Ganong, BBO 184300
Special Assistant Attorney General
Department of Workforce Development
Charles F. Hurley Building
19 Staniford Street - 5th Floor
Boston, MA  02114
(617) 626-5600

Dated: April 11, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

05 10717 RGS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _June C. Edmonds v Elaine_
_Chao_

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

   ___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

   ___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

   ___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

   ___  V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                    YES          (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                    YES          (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                   (YES)          NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                    YES          (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                   (YES)          NO

   A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

        (EASTERN DIVISION)          CENTRAL DIVISION          WESTERN DIVISION

   B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
        GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

        EASTERN DIVISION          CENTRAL DIVISION          WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _JULIANA DEHANN RICE   ASS'T ATTY GENERAL_
ADDRESS _ONE ASHBURTON PLACE  BOSTON MA 02108_
TELEPHONE NO. _617 727 2200  x 2063_

(Cover sheet local.wpd - 11/27/00)

®JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff    Norfolk<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number)<br>Juliana deHaan Rice, Assistant Attorney General<br>One Ashburton Place, Boston MA  02108  617-727-2200 x2062 | Attorneys (If Known)<br>Michael J. Sullivan, United States Attorney for the District of<br>Massachusetts |

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

| | |
|---|---|
| ❏ 1  U.S. Government<br>Plaintiff | ❏ 3  Federal Question<br>(U.S. Government Not a Party) |
| ☒ 2  U.S. Government<br>Defendant | ❏ 4  Diversity<br>(Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                             and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place<br>of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place<br>of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a<br>Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ❏ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | | | ❏ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ❏ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ❏ 2 Removed from<br>State Court | ❏ 3 Remanded from<br>Appellate Court | ❏ 4 Reinstated or<br>Reopened | ❏ 5 Transferred from<br>another district<br>(specify) | ❏ 6 Multidistrict<br>Litigation | ❏ 7 Judge from<br>Magistrate<br>Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5 U.S.C. 701-706; 28 U.S.C. 2201
Brief description of cause:
Judicial review of U.S. Department of Labor decision disallowing Job Training Partnership Act funds

## VII. REQUESTED IN    COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ❏ Yes    ☒ No

## VIII. RELATED CASE(S)    IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
4/11/05

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**U.S. Department of Labor**　　Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20201



In the Matter of:

COMMONWEALTH OF MASSACHUSETTS,　　　ARB CASE NO. 04-170

　　　　COMPLAINANT,　　　　　　　　　ALJ CASE NO. 98-JTP-6

　　v.　　　　　　　　　　　　　　　　DATE: March 11, 2005

UNITED STATES DEPARTMENT OF LABOR,

　　　　RESPONDENT.

BEFORE:　　THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant:*
　　Robert K. Ganong, Esq., *Commonwealth of Massachusetts Department of Labor and Workforce Development, Boston, Massachusetts*

*For the Respondent:*
　　Frank P. Buckley, Esq., Harry L. Sheinfeld, Esq., Charles D. Raymond, Esq., *United States Department of Labor, Washington, D.C.*

## FINAL DECISION AND ORDER

　　This case arises under the Job Training Partnership Act of 1982, as amended (JTPA or the Act), 29 U.S.C.A. §§ 1501 *et seq.* (West 1999). During the period that the JTPA was in effect, the states received funds for use in state-wide and local programs to "prepare youth and adults facing serious barriers to employment for participation in the labor force by providing job training and other services that will result in increased employment and earnings . . . ."[1] 29 U.S.C.A. § 1501.[2] The statute established a number

---
[1]　　Congress enacted the JTPA in 1982 and it was in effect from July 1, 1983, until repealed effective July 1, 2000. Pub. L. No. 105-220, Title I, § 199(b)(2), (c)(1)(B) (Aug. 7, 1998), 112 Stat. 1059; Pub. L. No. 97-300, §§ 161-172 (Oct. 13, 1982), 96 Stat. 1347.

Continued. . .

of programs, but this case deals exclusively with training services for disadvantaged youth and adults under Title II, and with employment and training assistance for dislocated workers under Title III.[3] Under both Titles II and III, the Secretary of Labor disbursed JTPA funds to the governor of each state. 29 U.S.C.A. § 1531; 20 C.F.R. § 627.200(b) (1994-1996).

Under Title II, the governor distributed those funds to local Service Delivery Areas to facilitate the implementation of job training plans. 29 U.S.C.A. §§ 1511, 1514; 20 C.F.R. Pt. 628, Subpt. D. The Service Delivery Area (SDA) was headed by a grant recipient, frequently a local government unit. 29 U.S.C.A. § 1511; 20 C.F.R. §§ 628.405, 628.415. Also key to the SDA system was the administrative entity, which was responsible for implementation of the local job training plan. 29 U.S.C.A. §§ 1503(2), 1514; 20 C.F.R. §§ 628.405, 628.415. The SDA utilized service providers – including public agencies, private non-profit organizations and private companies – to deliver educational, training, employment and supportive services to JTPA participants. 29 U.S.C.A. § 1517; 20 C.F.R. §§ 626.5 (def. of "service provider"), 627.422. The SDA also contracted with vendors to provide goods and services necessary to SDA operations. 20 C.F.R. § 626.5 (def. of "vendor"); *see* 20 C.F.R. § 627.420. Under Title III, the governor was authorized to expend funds for approved employment and training assistance programs through other substate grantees, in addition to the SDAs. 29 U.S.C.A. §§ 1661 – 1661c; 20 C.F.R. Part 631, Subpts. D, E, F.

This case involves the Department of Labor's action to establish the misexpenditure of JTPA grant funds by the Commonwealth of Massachusetts and its subrecipient, the City of Lynn,[4] and to recover the amount of those funds from

---

[2]    The purpose of the JTPA was modified by the 1992 amendments to the Act. Pub. L. No. 102-367, Title I, § 101(b) (Sept. 7, 1992), 106 Stat. 1022. We quote from the post-1992 amendments version of the Act's purpose, which was in effect during the time the program operations that are involved in this case occurred. *See* discussion *infra* at Part I.A.

[3]    *See* 29 U.S.C.A. §§ 1601, 1661; *see also* 59 Fed. Reg. 45760 (Final rule, 20 C.F.R. Pts. 626-31, 637) (Sept. 2, 1994).

[4]    The City of Lynn functioned as the grant recipient for the Lynn SDA. Grant Officer's exhibit (GX) 1 at pp. 131-33; *see* 20 C.F.R. § 628.415(a) (1994-1996). Other units of local government were included within the Lynn SDA, which was also known as the Southern Essex SDA and the Northshore SDA. GX 1 at pp. 131-32. The administrative entity for the Lynn SDA was Northshore Employment Training. GX 1 at 114, 133; *see* 20 C.F.R. § 628.415(a). In this decision, references to "Lynn," the "Lynn SDA" and "Northshore" all may be read as referring to the Lynn SDA operation that was sited at the Northshore facility, depending on the context.

Massachusetts.[5]  Following a lengthy audit resolution process in which Massachusetts was provided opportunities to offer documentation to justify the questioned costs, the Department of Labor Grant Officer issued a Revised Final Determination on November 8, 1999.[6]  In that determination, the Grant Officer found that $9,107,986 in costs that Massachusetts claimed for Lynn JTPA operations during the period of July 1, 1994, through June 30, 1996, should be disallowed.[7]  Grant Officer's exh. (GX) 2 at pp. 8-18. The Grant Officer further found that Massachusetts had not established eligibility for a Secretarial waiver of liability for repayment.  *Id.* at 12-18.  At Massachusetts's request, a hearing was held before an Administrative Law Judge (ALJ) regarding the amount of

---

[5]      Pursuant to Section 164(e) of the JTPA, the recipient State may be held fully accountable for funds "misspent" by a subrecipient, i.e., spent to cover costs for which JTPA funding requirements have not been met. 29 U.S.C.A. § 1574(e); *see* 20 C.F.R. § 627.702 (1994-96).

[6]      The audit resolution process occurred in two stages.  The first stage ended with Massachusetts's request for hearing before an administrative law judge regarding the Final Determination that the Grant Officer issued on May 13, 1998.  GX 1 at pp. 8-18; *see* 20 C.F.R. §§ 627.481, 627.606 (1997).  On April 14, 1999, the ALJ issued an order denying the Grant Officer's motion for summary judgment and remanding the case for further proceedings before the Grant Officer. ALJ exh. (ALJX) 1A; *see* 20 C.F.R. § 627.606 (1998). The ALJ retained jurisdiction of the case while directing the Grant Officer to allow Massachusetts an opportunity to submit documentation regarding both the allowability of questioned costs and Massachusetts's eligibility for waiver of liability for recovery of any disallowed costs.  ALJX 1A.  Following issuance of the Grant Officer's Revised Final Determination on November 8, 1999, the case returned for a hearing before the ALJ.  ALJ's Oct. 29, 2001 Dec. and Ord. at 3.

[7]      Through a state administrative action begun in November 1995, Massachusetts levied a debt against Lynn for misexpended JTPA funds in the amount of $9,160,208.  GX 1 at pp. 32-34, 114-15.  After completing the state administrative hearing and appeals process, Lynn continued its challenge to the Massachusetts determination through a state court action.  *See* ALJ's Oct. 29, 2001 Dec. and Ord. at 5-6.  Lynn has not been a party to this Department of Labor adjudication, either before the ALJ or on appeal before this Board.  The ALJ did not find it necessary to reach the question of whether Massachusetts should be estopped from adopting its position in this matter regarding the allowability of certain costs because that position is inconsistent with that which Massachusetts took in establishing a debt against Lynn.  S.D.O.R. at 12 n.15; ARB Dec. of Rem. at 9-10, 14.  The Grant Officer has not pursued the question of judicial estoppel on appeal, and we therefore need not address it.  *See* Grant Ofcr. Nov. 15, 2004 brief at 12; *but see* Grant Ofcr. Oct. 15, 2002 Brief to Admin. Law Judge on Remand at 6-16 (urging that Massachusetts should be judicially estopped from relying on specific documentation to support the allowance of Title II FY 1995 costs when Massachusetts had rejected that documentation as inadequate in the state administrative action against Lynn).

misexpended funds and whether Massachusetts was eligible for a waiver of liability. *See* 20 C.F.R. § 627.802(e) (1998).[8]

This appeal involves the second decision that the ALJ has issued in this case. In his first decision, the ALJ upheld the Grant Officer's findings that $4,064,203 in costs must be disallowed but reversed the Grant Officer's disallowance of $5,043,783 in other costs. Decision and Order issued Oct. 29, 2001 (ALJ's Oct. 29, 2001 Dec. and Ord.) at 16-19. The ALJ also concluded that Massachusetts had failed to establish eligibility for waiver of liability for the disallowed costs pursuant to Section 164(e)(2) of the Act, 29 U.S.C.A. § 1574(e)(2). *Id.* at 20-21. Each party appealed the ALJ's decision to the Board.

In our first decision, we concluded that it was necessary for the ALJ to render further findings to clarify the time periods that are at issue and to ascertain the applicable statutory and regulatory provisions. *Massachusetts v. United States Dep't. of Labor,* ARB Nos. 02-011, -021, slip op. at 2 n.2, 3, 7-14 (June 13, 2002) (ARB Dec. of Rem.). This case centers on whether the financial management systems in place for Lynn's JTPA program met relevant statutory and regulatory requirements, and whether Massachusetts fulfilled its JTPA obligation to oversee Lynn's fiscal controls and accounting records. The JTPA, its implementing regulations, and the related Single Audit Act of 1984, Pub. L. No. 98-502 (Oct. 19, 1984), 98 Stat. 2327, were amended during the funding periods that the case record suggested were involved. ARB Dec. of Rem. at 8-10. As we discussed in our previous decision, the parties, the witnesses and the documentary evidence, including the Grant Officer's determinations, used the terms "fiscal year" and "program year" ambiguously. *Id.* at 2 n.2, 3, 10-14. It was thus necessary to clarify the specific funding periods that are at issue in order to identify the controlling statutory and regulatory provisions. *Id.* at 10-14.

We therefore remanded the case to the ALJ to identify the funding periods that the Grant Officer's determinations covered, and to render findings regarding the meanings attached to "fiscal year" and "program year" as used throughout the case record. ARB Dec. of Rem. at 13-14. We also directed the ALJ, after determining the specific statutory and regulatory provisions that apply to the funding periods at issue, to re-examine the allowability of costs issues. *Id.* at 10, 13-14. In addition, we instructed the ALJ to render further findings regarding Massachusetts's eligibility for a Secretarial waiver of liability

---

[8]    We cite the procedural regulations regarding a hearing before an administrative law judge that were in effect when Massachusetts requested the hearing in May 1998, *see* GX 1 at pp. 5-6. As we address at Part I.A. infra, the applicable regulatory requirements for JTPA program operations are those in effect during the years that the questioned program operations occurred. *See Louisiana v. United States Dep't of Labor,* 108 F.3d 615 (5th Cir. 1997); *Central Valley Opportunity Ctr. v. United States Dep't of Labor,* ARB No. 98-046, ALJ No. 95-JTP-9 (ARB June 22, 1998).

for repayment of disallowed costs, pursuant to the "substantial compliance" standard provided by Section 164(e)(2)(A)-(D) of the Act, 29 U.S.C.A. § 1574(e)(2)(A)-(D).  *Id.*

On July 27, 2004, the ALJ issued the Supplemental Decision and Order Upon Remand (S.D.O.R.) that is the subject of this appeal.  The ALJ determined that the Grant Officer had properly disallowed the entire $9,107,986 in costs under Title II and III that are at issue.  The ALJ further found that Massachusetts was not eligible for a waiver of liability for repayment of the $9,107,986.  We have reviewed the ALJ's decision on remand, the case record, the pertinent legal authorities, and the parties' arguments.  For the reasons we discuss below, we conclude that the ALJ's decision is fully supported by the record evidence and is in accordance with relevant law.  We therefore affirm that decision.

### JURISDICTION AND STANDARD OF REVIEW

The Administrative Review Board is the designee of the Secretary in rendering final agency decisions under the JTPA and other statutes included in Secretary's Order No. 1-2002, 67 Fed. Reg. 64,272 (Oct. 17, 2002).  On September 14, 2004, pursuant to Section 166(b) of the JTPA, 29 U.S.C.A. § 1576(b), the Board asserted jurisdiction of this appeal.  We render our decision in this case pursuant to Section 166(c) of the Act, 29 U.S.C.A. § 1576(c), and, as the Secretary's designee, we review both the ALJ's findings of fact and conclusions of law de novo.  *See generally Masek v. Cadle Co.,* ARB No. 97-069, ALJ No. 95-WPC-1, slip op. at 7 and authorities there cited (ARB Apr. 28, 2000) (in case arising under whistleblower statute covered by 29 C.F.R. Part 24, discussing Secretary's plenary authority in reviewing administrative law judges' decisions).

### ISSUES PRESENTED

1)  Did the ALJ properly conclude that $9,107,986 in costs should be disallowed?

2)  Did the ALJ properly conclude that Massachusetts was ineligible for a Secretarial waiver of liability for repayment of the disallowed costs?

### DISCUSSION

## I.  Relevant Authorities

### A.  Do the 1992 amendments to the JTPA and the 1996 amendments to the Single Audit Act apply to the funding periods at issue?

On remand, it was necessary for the ALJ to determine initially the dates during which the JTPA operations that are at issue had occurred and to identify the corresponding statutory and regulatory authorities that apply.  ARB Dec. of Rem. at 14.  To resolve the ambiguities in the record regarding the periods during which the questioned JTPA costs arose, the ALJ instructed the parties to submit briefs and proposed stipulations on remand.  S.D.O.R. at 2; *see id.* at Table of Disallowed Costs.  The ALJ

then clarified the record regarding the time period that the Grant Officer's determinations cover and the respective funding periods that remain in dispute between the parties. S.D.O.R. at 2-4. Specifically, the ALJ concluded that the Grant Officer's determinations cover July 1, 1992, through June 30, 1996. *Id.* at 2-3. He further found that the Grant Officer's determinations should be construed as using the Massachusetts fiscal year, rather than the JTPA program year, as the chronological frame of reference.[9] *Id.* at 3-4. He also reconciled the ambiguities and conflicts in other record references to "fiscal year" and "program year." *Id.*

The ALJ discussed the amendments to the JTPA, to the implementing regulations and to the Single Audit Act that were executed during the 1992 - 1996 period that the Grant Officer's determinations covered. S.D.O.R. at 4-8; *see* ARB Dec. of Rem. at 8-9. The ALJ also identified the specific statutory provisions and the implementing regulations that were in effect during each of the four fiscal years that the Grant Officer's determinations covered. S.D.O.R. at 7-8. However, since the parties' dispute before the ALJ covered only costs arising during the period of July 1, 1994, through June 30, 1996 – or Massachusetts fiscal years 1995 and 1996 – it was necessary for the ALJ to apply only the authorities that were in effect during that two-year period. S.D.O.R. at 2-4, 9-15.

As the ALJ properly determined, the Job Training Reform Amendments of 1992, which became effective July 1, 1993, were in effect during the two funding years that are at issue, Massachusetts fiscal year (FY) 1995 and FY 1996. S.D.O.R. at 4-8; Pub. L. No. 102-367, Title I, § 101(b) (Sept. 7, 1992), 106 Stat. 1022. As the ALJ also discussed, the post-amendments JTPA regulations at 20 C.F.R. Parts 626-628, 631 apply to Massachusetts FY 1995 and FY 1996. S.D.O.R. at 4-8; 59 Fed. Reg. 45760 (Pts. 626-631, 637, Final rule) (Sept. 2, 1994); 57 Fed. Reg. 62004 (Pts. 626-631, 637, Interim final rule) (Dec. 29, 1992). The interim final rules were in effect from their publication before the July 1, 1993 effective date of the statutory amendments until June 30, 1995, when the

---

[9]     As we discussed in our first decision, the numerous ambiguous references to the funding periods that are at issue included reference to the Massachusetts FY and the JTPA program year (PY) as though those terms were synonymous. ARB Dec. of Rem. at 2 n.2, 10-12. The Massachusetts FY and the JTPA PY both run from July 1 through the following June 30. *Id.* at 2 n.2 and authorities and record sources there cited. However, because the Massachusetts FY is identified by reference to the year in which the 12-month period ends and the JTPA PY is identified by reference to the year in which the 12-month period begins, the terms "fiscal year" and "program year" could not be used interchangeably in this case. *Id.* Rather, as the parties' stipulated Table of Disallowed Costs demonstrates, Massachusetts FY 1995 runs July 1, 1994 through June 30, 1995, whereas JTPA PY 1995 runs July 1, 1995 through June 30, 1996. *See* S.D.O.R. at 2-4, Table of Disallowed Costs.

final rules became effective. *See id.*[10] Consequently, the interim rules were in effect for Massachusetts FY 1995 – i.e., July 1, 1994–June 30, 1995 – and the final rules were in effect for Massachusetts FY 1996 – i.e., July 1, 1995–June 30, 1996. We agree with the ALJ's assessment that the final versions of the relevant regulatory provisions do not differ significantly from the interim versions of those particular provisions. S.D.O.R. at 10 n.11; *see id.* at 6 and authorities there cited.

With regard to the Single Audit Act (SAA), the ALJ properly found that the 1996 amendments to the SAA were effective for fiscal years beginning after June 30, 1996, and thus did not apply to Massachusetts FY 1995 and FY 1996. S.D.O.R. at 7-8; Pub. L. No. 104-156, § 3 (July 5, 1996), 110 Stat. 1396, 1404; 15 U.S.C.A. §§ 7501–7507 (West 2003); *see* Pub. L. No. 98-502 (Oct. 19, 1984), 98 Stat. 2327. Consequently, the SAA amendments' change from OMB Circular A-128 to Circular A-133 for local and state government grantees did not affect the audit requirements imposed on Massachusetts and its subrecipient Lynn. S.D.O.R. at 7-8 and authorities there cited. The regulations that implement the SAA for JTPA grantees, found at 29 C.F.R. Part 96, remained unchanged during the Massachusetts FY 1995–FY 1996 period. *See* 29 C.F.R. § 96.101 (1994-1996).

## B. Controlling statutory and regulatory requirements

### 1. State and SDA fiscal control and record-keeping responsibilities

The 1992 JTPA amendments were intended to enhance fiscal and program accountability among recipients and subrecipients. H.R. Rep. No. 102-240, pt. IV at 50, pt. V at 64 (1991), *reprinted in* 1992 U.S.C.C.A.N. 912, 919, 934; S.D.O.R. at 4-9 and authorities there cited. The allowability of costs and waiver of liability questions that are before us turn on the interpretation of the pertinent fiscal controls and record-keeping requirements of Sections 164 and 165 of the Act, 29 U.S.C.A. §§ 1574, 1575. As the ALJ discussed, the JTPA amendments imposed financial management requirements on state recipients like Massachusetts and subrecipients like Lynn in addition to those that the JTPA and the related SAA already imposed. S.D.O.R. at 4-9. Lynn, as the SDA grant recipient, was responsible for implementing the Title II local job training plan for the disadvantaged youth and adults through Northshore, the SDA administrative entity. GX 1 at pp. 215-16; *see* 20 C.F.R. §§ 628.415, 628.420. Under Title III, Northshore was responsible for providing assistance to dislocated workers pursuant to a substate plan. HT 318-19 (Dunkin), *see* 20 C.F.R. Part 631, Subpt. F. In order to facilitate the provision of JTPA services to the local work force, it was necessary for Northshore, in

---

[10]     As the ALJ noted, the interim final rules that were published December 29, 1992, were scheduled to be replaced by the final regulations on June 1, 1993. S.D.O.R. at 8 n.9; 57 Fed. Reg. 62004 (Dec. 29, 1992). However, publication of the final regulations was delayed until September 1994. 59 Fed. Reg. 45760 (Pts. 626-631, 637, Final rule) (Sept. 2, 1994); 58 Fed. Reg. 31471 (Pts. 626-631, 637, Interim final rule, amendments) (June 3, 1993).

addition to maintaining its office space, administrative and training staffs, to award contracts or subgrants to a number of service providers and vendors to provide other authorized JTPA training and related assistance. *See, e.g.,* HT at 436-37, 452 (Manning, testifying regarding "in-house" Title II services provided at Northshore), 327-29 (Durkin, testifying regarding various Title III expenses including training vendors, rent, staff salaries and expenses). In the first instance, Lynn bore responsibility for maintaining fiscal controls and accounting systems to cover the financial transactions necessary for its JTPA operations. And as we discuss below, the JTPA and implementing regulations also imposed obligations on Massachusetts that required it to ensure that Lynn met its financial management and record-keeping responsibilities.

### *The complexities of the SDA financial management system*

SDA operations required highly developed fiscal control and accounting systems. The JTPA imposed stringent restrictions on the use of funds, ranging from the criteria defining who qualified for participation in specific JTPA programs to extensive procedures to ensure fair, competitive procurements of goods and services. *See* 20 C.F.R. §§ 627.235, 627.420. Lynn was obligated not only to implement and maintain fiscal controls that ensured that Northshore funds were expended in compliance with all pertinent JTPA requirements, but also to maintain adequate records to *demonstrate* that such expenditures complied with the Act. These fiscal control and record-keeping requirements, which are central to disposition of this case, are found at Sections 164(a)(1) and 165(a)(1) of the Act. Section 164(a)(1), which was added by the 1992 amendments, provides:

> Each State shall establish such fiscal control and fund accounting procedures as may be necessary to assure the proper disbursal of, and accounting for, Federal funds paid to the recipient under titles II and III. Such procedures shall ensure that all financial transactions are conducted and records maintained in accordance with generally accepted accounting principles applicable in each State.

29 U.S.C.A. § 1574(a)(1). Section 165(a)(1), which was unchanged by the 1992 amendments, provides:

> Recipients shall keep records that are sufficient to permit the preparation of reports required by this Act and to permit the tracing of funds to a level of expenditure adequate to insure that the funds have not been spent unlawfully.

29 U.S.C.A. § 1575(a)(1). The regulation at Section 627.425 provides "standards for financial management and participant data systems" and implements these statutory provisions. 20 C.F.R. § 627.425. Section 627.425(b) elaborates on the State's responsibility to ensure that the SDA is meeting its fiscal control and record-keeping responsibilities. In addition, Section 627.425(b) contains requirements regarding two

financial management concepts that are especially significant in this case. First, Section
627.425(b) provides further guidance regarding the Section 164(a)(1) requirement that
financial accounting systems comply with generally accepted accounting principles
(GAAP). *See* 29 U.S.C.A. § 1574(a)(1) (quoted *supra*). The GAAP requirement figures
prominently in the ALJ's disallowance of costs analysis. S.D.O.R. at 8-15 *passim*. In
addition, Section 627.425(b)(1) lists source documentation as a basic GAAP requirement,
and the lack of source documentation plays a critical role in the ALJ's analysis.[11] *See id.*
Specifically, Section 627.425(b) provides:

> *Financial systems.* Recipients and subrecipients shall
> ensure that their own financial systems as well as those of
> their subrecipients provide fiscal control and accounting
> procedures that are:
>
> (1)  In accordance with generally accepted accounting
> principles applicable in each State including:
> > (i)    Information pertaining to subgrant and
> > contract awards, obligations, unobligated
> > balances, assets, liabilities, expenditures,
> > and income;
> > (ii)   Effective internal controls to safeguard
> > assets and assure their proper use;
> > (iii)  A comparison of actual expenditures with
> > budgeted amounts for each subgrant and
> > contract;
> > (iv)   Source documentation to support accounting
> > records; and
> > (v)    Proper charging of costs and cost
> > allocation[.]
>
> (2)  Sufficient to:
> > (i)    Permit preparation of required reports;[12]
> > (ii)   Permit the tracing of funds to a level of
> > expenditure adequate to establish that funds

---

[11]    For purposes of our analysis in this case, source documentation includes checks,
invoices and similar documents that establish the identity of the recipients of funds that the
Lynn SDA disbursed. HT 127-28. (Lonergan, on questioning by ALJ).

[12]    Among the "required reports" are the quarterly financial reports that amended Section
165(f)(1) required substate grantees to submit to the governor, including "information
identifying all program costs by cost category in accordance with generally accepted
accounting principles and by year of the appropriation." 29 U.S.C.A. § 1575(f)(1); *see* 20
C.F.R. §§ 627.440, 627.455.

have not been used in violation of the applicable restrictions on the use of such funds;

(iii)   As required by section 165(g), permit the tracing of program income, potential stand-in costs and other funds that are allowable except for funding limitations, as defined in [section] 627.480(f) of this part, Audits; and

(iv)   Demonstrate compliance with the matching requirement of section 123(b)(2) [29 U.S.C.A. § 1533(b)(2) (State education coordination and grants)].

20 C.F.R. § 627.425(b) (1995-96).[13]   Massachusetts was thus responsible for ensuring that Lynn maintained fiscal controls that ensured that expenditures complied with various JTPA restrictions and accounting records to demonstrate such compliance.   An examination of three of the basic restrictions imposed on an SDA's use of Title II and Title III funds will demonstrate the types of information that Lynn was required to maintain in its financial management systems "to permit the tracing of funds to a level of expenditure adequate to establish that funds have not been used in violation of the applicable restrictions on the use of such funds."[14]   Review of these basic restrictions will also illustrate the importance of an SAA audit in evaluating whether SDA expenditures comply with JTPA requirements.

### *Cost principles, cost classifications and limitations on certain costs*

Under both Title II and Title III, SDA expenditures must comply with the general cost principles enumerated at Section 164(a)(2), including the requirement that the cost "be necessary and reasonable to the proper and efficient administration of the program." 29 U.S.C.A. § 1574(a)(2); 20 C.F.R. § 627.435(a).   In addition, the SDA must properly classify Title II and III expenditures according to specified categories.   29 U.S.C.A. § 1518(a); 20 C.F.R. §§ 627.440(a), 631.13(a)(2).   Under Title II-A (disadvantaged adults) and Title II-C (disadvantaged youth) programs, the SDA must "plan, control and charge" expenditures according to these three categories: administration; training-related and

---

[13]   We have quoted the final version of the regulation, which became effective June 30, 1995.   59 Fed. Reg. 45760, 45781 (Sept. 2, 1994).   As the ALJ discussed, S.D.O.R. at 6, the only difference between Section 627.425(b) in its interim and final forms is the addition of the "applicable in each state" wording that was added to Subsection (b)(1) to clarify the requirement that each state adopt some version of GAAP.   59 Fed. Reg. at 45781.

[14]   Restrictions on the use of funds vary according to the particular program and the type of grantee – i.e., state, SDA or other substate grantee – that is administering the program. *See, e.g.,* 20 C.F.R. § 627.445(a), (b).

supportive services; and direct training services. 29 U.S.C.A. § 1518(b); *see* 20 C.F.R. § 627.440(d)(1) – (5); *but see* 20 C.F.R. § 627.440(c)(1), (2) (exempting incentive funds received pursuant to Sections 202(c)(1)(B) and 262(c)(1)(B), 29 U.S.C.A. §§ 1602(c)(1)(B) and 1642(c)(1)(B), from classification requirement). The SDA must classify Title II-B program expenditures as either training and supportive services or administration. 20 C.F.R. § 627.440(c)(1)(v),(vii); *see* 29 U.S.C.A. § 1632(a) (authorizing three uses for Title II-B funds). Under the Title III dislocated worker program, the SDA, acting as a substate grantee, must "plan, control and charge" expenditures under these five categories: rapid response services; basic readjustment services; retraining services; needs-related payment and supportive services; and administration. 20 C.F.R. § 631.13(a)(1); *see* 29 U.S.C.A. § 1661c(a) (authorizing five uses for Title III funds).

Finally, to successfully claim costs under Title II and Title III, the SDA must comply with minimum and maximum limits on costs for certain classifications. For Title II-A and II-C programs, the statute imposes a minimum floor for direct training costs of no less than fifty percent of the funds allocated to the SDA for the program year respectively under Title II-A and Title II-C. 29 U.S.C.A. § 1518(b)(4)(B); *see* 20 C.F.R. § 627.445(b); *but see* 20 C.F.R. § 627.445(c)(2) (allowing States and SDAs the three-year period of fund availability to comply with cost limitations). The statute also limits administrative costs for Title II-A and II-C programs to a maximum of twenty percent. 29 U.S.C.A. § 1518(b)(4)(A); *see* 20 C.F.R. § 627.445(b); *but see* 20 C.F.R. § 627.445(d) (exempting administrative costs incurred by community based organizations or non-profit service providers, in certain circumstances). Under Title II-B, the SDA must comply with a fifteen percent cap on administrative costs. 29 U.S.C.A. § 1632(a)(3); 20 C.F.R. § 627.445(b)(3). When acting in its role as a substate grantee under the Title III dislocated worker program, the SDA must comply with the requirement that a minimum percentage of fifty percent of its Title III funds be expended for retraining services. 29 U.S.C.A. § 1661d(a); 20 C.F.R. § 631.14(a). The SDA must also comply with the maximum limits for two categories of Title III costs, *viz.,* needs-related payment and supportive services, which is capped at twenty-five percent, and administration, which is capped at fifteen percent. 29 U.S.C.A. § 1661d(b)-(c); 20 C.F.R. § 631.14(b)-(c).

In sum, to demonstrate compliance with JTPA cost principles, cost classifications and limitations on certain costs, SDA financial management systems must record not only the details of financial transactions but also must provide an accounting of the aggregate costs expended according to the specific Title II or III program. For example, records establishing that a particular expense was paid as salary to a Northshore staff person who was responsible for procuring retraining services for dislocated workers under Title III-A may show that the cost qualified as "necessary and reasonable for the proper and efficient administration of the program," under 20 C.F.R. § 627.435(a), and that the expense was properly classified as an administrative cost, under 20 C.F.R. §§ 627.440(a), 631.13(f)(1). Records pertaining to that specific expenditure alone would not, however, demonstrate whether or not that cost, combined with other Title III-A administrative costs, exceeds the applicable fifteen percent limit for administrative costs under Title III. *See* 29 U.S.C.A. § 1661d(c); 20 C.F.R. § 631.14(c). As we discuss in the

next section, the SAA audit that JTPA grantees are required to conduct provides a comprehensive review of an SDA's expenditures and thus addresses compliance with applicable cost limitations.

### The requirement that JTPA grantees conduct audits under the SAA

As the ALJ discussed, Section 164(a) and (b) of the JTPA, as originally enacted in 1982, required that grantees conduct audits no less than once every two years. S.D.O.R. at 6-7; Pub. L. No. 97-300, § 164 (Oct. 13, 1982), 96 Stat. 1348. The 1992 amendment of Section 164(a), (b) deleted that requirement. Pub. L. No. 102-367, § 142 (Sept. 7, 1992), 106 Stat. 1046. However, as the ALJ explained, the pre-1992 JTPA amendments audit provision was effectively supplanted by the annual audits provision of the SAA, which was enacted in 1984 for general application to state and local government recipients of Federal financial assistance. S.D.O.R. at 6-7 and authorities there cited; Pub. L. No. 98-502, § 1 (Oct. 19, 1984), 98 Stat. 2327.[15] Before and after the 1992 JTPA amendments, JTPA regulations at 29 C.F.R. Part 96 implemented the SAA requirement for JTPA grantees. *Id.* The JTPA program regulations at 20 C.F.R. Part 627 also reference the SAA and the requirement that audits for state and local governmental units be conducted in accordance with OMB Circular A-128. Specifically, Section 627.480(a)(1) provides:

> Each recipient and governmental subrecipient is responsible for complying with the Single Audit Act of 1984 (15 U.S.C. 7501-7) and 29 CFR part 96, the Department of Labor regulations which implement Office of Management and Budget (OMB) Circular A-128, "Audits of State and Local Governments."

20 C.F.R. § 627.480(a)(1) (1994-96). Subject to certain conditions, the SAA and OMB Circular A-128 afforded each governmental grantee the option of having an independent auditor annually audit all the grantee's operations or audit all its "departments, agencies or establishments that received, expended or otherwise administered Federal financial assistance during the year." 29 C.F.R. Pt. 96, App. A, OMB Circ. A-128 at ¶ 6.b. In either case, Circular A-128 required the auditor to determine whether the auditee "has internal control systems to provide reasonable assurance that it is managing Federal assistance programs in compliance with applicable laws and regulations." *Id.* at ¶ 8. The auditor was required to select and test a representative number of charges from each major Federal assistance program. *Id.* at ¶ 8.b.(2). In testing those transactions, the auditor was required to determine whether expenditures were for allowable services and whether those who received the services or benefits were eligible. *Id.* at ¶ 8.b.(2)(a). Following completion of the audit, the auditors must compile their findings regarding the

---

[15] The exemptions from the annual audit requirements that are provided by the SAA are not relevant to this case. *See* 31 U.S.C.A. § 7502.

auditee's financial statements, the auditee's internal control systems and compliance or non-compliance in the tested areas into a report. *Id.* at ¶ 13. As a subrecipient, an SDA was obligated to provide a copy of the auditor's report to the state, which in turn was obligated, as the recipient of grant funds directly from the federal government, to provide a copy of the report to all the federal departments or agencies from which it received funds. *Id.* at ¶ 13.f.

Just as Section 627.425(b) required a state to ensure that subrecipients were fulfilling their obligations to maintain adequate fiscal control and accounting procedures, Section 627.480(d) and Circular A-128 required the state to ensure that subrecipients met their SAA obligations. 29 C.F.R. Pt. 96, App. A, OMB Circ. A-128 at ¶ 9; *see* 20 C.F.R. 627.480(d). We discuss Massachusetts's oversight obligations in more detail in connection with the issue of Massachusetts's eligibility for waiver of liability for repayment of any disallowed costs, infra at Part III.

### 2. The parties' burdens

The JTPA regulations provide a specific burden-shifting framework that applies when a grantee challenges the Grant Officer's determination before an ALJ, as Massachusetts has in this case. Section 627.802(e) provides:

> *Burden of production.* The Grant Officer shall have the burden of production to support her or his decision. To this end, the Grant Officer shall prepare and file an administrative file in support of the decision which shall be made part of the record. Thereafter, the party or parties seeking to overturn the Grant Officer's decision shall have the burden of persuasion.

20 C.F.R. § 627.802(e); *see* 29 U.S.C.A. § 1576(a); 20 C.F.R. § 627.800(a); *see also Tex. Dep't of Commerce v. United States Dep't of Labor,* 137 F.3d 329, 332 (5th Cir. 1998) (applying the predecessor regulation at 20 C.F.R. § 636.10(g)).

### *Regarding the allowability of costs*

When this case was initially before the ARB, we summarized the parties' burdens regarding the disallowance of costs as follows:

> [T]he burden of production is on a Grant Officer to offer *prima facie* evidence that funds have been misspent by a recipient or subrecipient, *i.e.,* that requirements for Federal funding had not been met. 20 C.F.R. § 627.802(e) (1998). If the Grant Officer meets that burden, the burden then shifts to the recipient or subrecipient, who is challenging the Grant Officer's determination, to offer persuasive evidence to the contrary. . . .

ARB Dec. of Rem. at 5 (citations omitted). In this case, the "requirements for Federal funding" that are in dispute are the fiscal controls and record-keeping requirements that the JTPA imposes on a grantee. As we also stated in our first decision:

> Overcoming a *prima facie* case of "misspent" funds requires the grantee to present cogent evidence and argument regarding how it either met the specific requirements imposed by the JTPA or has compensated for any deficiencies through other means.

ARB Dec. of Rem. at 10 n.7. Briefly stated, the Grant Officer relied on evidence that Lynn did not conduct an SAA audit during Massachusetts FY 1995 or FY 1996, and that the documentation and testimony that Massachusetts offered to compensate for that omission is inadequate to demonstrate that the questioned expenditures complied with the Act and regulations. *See* S.D.O.R. at 8-14. Massachusetts relied on financial records for Lynn JTPA operations that it had compiled, evidence of an audit of the state agency that was overseeing JTPA operations, and testimony from state agency staff regarding on-site visits to Northshore. Massachusetts argued that such evidence was adequate to support allowance of the questioned costs. *Id.* As our analysis below indicates, disposition of this case turns on questions of law rather than the weighing of conflicting evidence. While there is little dispute between the parties regarding the facts that are established, the parties advocate differing interpretations of the relevant legal authorities. The Grant Officer advances an interpretation that requires more detailed, reliable, and extensive documentation to overcome the lack of an SAA audit than that which Massachusetts has submitted.

### *Regarding Massachusetts's eligibility for waiver of liability for repayment*

Subsections (d) and (e) of Section 164 of the Act impose liability for repayment of disallowed costs on grant recipients and delineate the conditions under which the Secretary may waive a recipient's liability for repayment. 29 U.S.C.A. § 1574(d), (e). Section 164(e)(1) prohibits a waiver if "the misexpenditure of funds was due to willful disregard of the requirements of this Act, gross negligence, or failure to observe accepted standards of administration." 29 U.S.C.A. § 1574(e)(1); *see Ariz. Dep't of Econ. Sec. v. United States Dep't of Labor,* ARB No. 96-036, ALJ No. 94-JTP-18, slip op. at 5-10 (ARB June 7, 1996). Before imposing liability for repayment on a recipient for a subrecipient's violations of the statute, Subsections (e)(2), (3) of Section 164 provide that the Secretary must determine whether the recipient, like Massachusetts in this case, "has adequately demonstrated" that it has "substantially complied" with the following four requirements:

> (A) established and adhered to an appropriate system for the award and monitoring of contracts with subgrantees which contains acceptable standards for ensuring accountability;

(B) entered into a written contract with such subgrantee which established clear goals and obligations in unambiguous terms;

(C) acted with due diligence to monitor the implementation of the subgrantee contract, including the carrying out of the appropriate monitoring activities (including audits) at reasonable intervals;

(D) taken prompt and appropriate corrective action upon becoming aware of any evidence of a violation of this Act or the regulations under this Act by such subgrantee.

29 U.S.C.A. § 1574(e)(2)(A)–(D). Sections 164(e)(1)-(3) are implemented by Section 627.704, which provides:

(a) A recipient may request a waiver of liability as described in section 164(e)(2) of the Act.
(b)(1) When the debt for which a waiver of liability is desired was established in a non-Federal resolution, such requests shall be accompanied by a resolution report.
(2) When the ETA Grant Officer is resolving the finding(s) for which a waiver of liability is desired, such request shall be made no later than the informal resolution period described in § 627.606(c) of this part.
(c) A waiver of the recipient's liability can only be considered by the Grant Officer when the misexpenditure of JTPA funds:
(1)    Occurred at a subrecipient level;
(2)    Was not a violation of section 164(e)(1) of the Act, or did not constitute fraud;
(3)    If fraud did exist, it was perpetrated against the recipient/subrecipient; and
(i) The        recipient/subrecipient        discovered, investigated,    reported,    and    prosecuted    the perpetrator of said fraud; and
(ii) After aggressive debt collection action, it can be documented that there is no likelihood of collection from the perpetrator of the fraud.
(4) The recipient has issued a final determination which disallows the misexpenditure, the recipient's appeal process has been exhausted, and a debt has been established; and
(5) The recipient requests such a waiver and provides documentation to demonstrate that it has substantially

complied with the requirements of section 164(e)(2)(A), (B), (C), and (D) of the Act.

(d) The recipient shall not be released from liability for misspent funds under the determination required by section 164(e) of the Act unless the Grant Officer determines that further collection action, either by the recipient or the subrecipient, would be inappropriate or would prove futile.

20 C.F.R. § 627.704 (1996-97).[16] The ALJ properly summarized the purpose of Section 164(e) as permitting the Secretary to waive the grantee's liability when, despite the recipient's having established appropriate oversight standards and having diligently adhered to those standards, the recipient could not prevent the subrecipient from violating the Act. S.D.O.R. at 15 (citing *Comm'r, Employment Sec. v. United States Dep't of Labor*, Nos. 90-JTP-29, 91-JTP-11, 92-JTP-34, slip op. at 4-5 (Sec'y Sept. 13, 1995)). The evidence relevant to whether Massachusetts substantially complied with the four criteria enumerated at Section 164(e)(2)(A)-(D) is comprised primarily of two State Policy Directives that concern SDA fiscal controls and their oversight by the State, and the documentary evidence and testimony regarding the steps Massachusetts took to fulfill its obligations. *See* S.D.O.R. at 15-21. As was the case with the allowability of costs issue, the question of Massachusetts's substantial compliance with the Section 164(e)(2)(A)-(D) criteria turns primarily on questions of law and not of fact. Regarding the substantial compliance question, the parties offer differing interpretations of not only the JTPA statute and regulations, but also of the Massachusetts Policy Directives. *See* discussion at Part III.B., *infra*.

## II. Allowability of Costs

### A. Title II FY 1995

#### 1. The ALJ's findings in his first decision

The ALJ reached a different conclusion regarding the allowability of the $4,861,178 in costs that are at issue for Title II FY 1995 on remand than he had in his original decision. As discussed above, the allowability of costs in this case turns on the

---

[16]    Like the ALJ, we have quoted Section 627.704 as it read in the final version of the regulations, which became effective June 30, 1995. The version quoted above reflects the modification of Section 627.704 to incorporate the provisions previously codified at Section 627.480(f). 59 Fed. Reg. 45760, 45789 (Sept. 2, 1994). As the ALJ noted, S.D.O.R. at 17 n.18, the differences in the text of the interim regulation at Section 627.704 and the final regulation quoted above are not relevant to the Section 164(e) issues that are involved in this case. *See* 29 C.F.R. § 627.704 (1993-94). It is thus unnecessary for us to cite the different versions for the regulation for the two respective funding periods that are at issue, July 1, 1994-June 30, 1995 and July 1, 1995-June 30, 1996.

question of whether Lynn maintained adequate fiscal control and record-keeping systems to properly disburse and account for JTPA funds. Without such fiscal controls and records, the grantee has not complied with the Section 165(a)(1) requirement to "keep records that are sufficient . . . to permit the tracing of funds to a level of expenditure adequate to insure that the funds have not been spent unlawfully." 29 U.S.C.A. § 1575(a)(1) (quoted *supra*); *see* 20 C.F.R. § 627.425(b)(2)(ii) (quoted *supra*). As the ALJ explained, a number of courts have concluded that a grantee's failure to maintain records in compliance with the JTPA or its predecessor statute, the Comprehensive Employment and Training Act, (CETA)[17] is tantamount to the unlawful expenditure of grant funds. S.D.O.R. at 9 (citing *Louisiana v. Untied States Dep't of Labor*, 108 F.3d 614, 618 (5th Cir. 1997); *Montgomery County v. Dep't of Labor*, 757 F.2d 1510, 1513 (4th Cir. 1985) (arising under the predecessor statute, CETA); *City of Oakland v. Donovan*, 703 F.2d 1104, 1107 (9th Cir.), *modified*, 707 F.2d 1013 (9th Cir. 1983) (also arising under CETA).

In his initial decision, the ALJ found that the Grant Officer had presented a prima facie case of "misspent" Title II funds for FY 1995 in the amount of $4,861,178 by demonstrating that Lynn had failed to comply with specific financial management requirements, including the lack of an SAA audit. ALJ's Oct. 29, 2001 Dec. and Ord. at 16-18; *see* 20 C.F.R. § 627.802(e) (quoted *infra*). However, the ALJ further found that Massachusetts had provided documentation regarding Lynn's fiscal control and record-keeping systems pertaining to those Title II funds that overcame the Grant Officer's prima facie case. Specifically, the ALJ found that Massachusetts had demonstrated that, for purposes of accounting for $4,861,178 in Title II costs for FY 1995, Lynn's fiscal control and record-keeping systems were adequate, despite the lack of an SAA audit. ALJ's Oct. 29, 2001 Dec. and Ord. at 18-19. The ALJ therefore concluded that the $4,861,178 in Title II FY 1995 costs had been properly expended and that the Grant Officer had improperly disallowed those costs. In reaching that conclusion, the ALJ credited the Reconstructed Trial Balance (RTB) that Massachusetts had submitted. *Id.* at 16-19. The RTB represented an accounting consultant's reconstruction of the Lynn SDA records, which was undertaken in an effort to produce an auditable set of financial records. *Id.; GX 3 at pp. 2, 7-28; see* ALJ's Oct. 29, 2001 Dec. and Ord. at 9. In crediting the RTB as adequate to demonstrate that the questioned expenditures had been properly disbursed and fully accounted for, the ALJ found that Massachusetts had established "that certain of the disallowed costs were expended for appropriate JTPA purposes." *Id.* at 18.

## 2. The ALJ's findings in the decision on remand

After clarifying the time periods that were at issue and identifying the pertinent statutory and regulatory provisions on remand, the ALJ re-examined the evidence

---

[17]    The Comprehensive Employment and Training Act, Pub. L. No. 93-203 (Dec. 28, 1973), 87 Stat. 839.

---

---

---

---


---

Noting that the 1992 JTPA amendments were intended to enhance fiscal and program accountability among recipients and subrecipients, the ALJ concluded that the lack of an SAA audit and the Grant Officer's testimony regarding the importance of an audit in justifying JTPA costs constituted prima facie evidence that Lynn had failed "to maintain accurate and reliable financial records sufficient to permit the tracing of funds to insure that the funds were not spent unlawfully." S.D.O.R. at 10-11. The ALJ then analyzed whether the RTB and related documentation regarding Title II costs that Massachusetts offered were adequate to overcome the lack of an audit for FY 1995. S.D.O.R. at 11-12.

### *The documentation that Massachusetts submitted to overcome the lack of an audit*

The RTB stated that $4,861,178 in Title II costs for FY 1995 should be allowed but acknowledged that $1,049,288 should be disallowed. GX 3 at p. 4. In support of the RTB, Massachusetts also submitted monthly balance sheets and profit/loss statements covering Lynn's Title II operations. *Id.* at pp. 12-28. Massachusetts also stated that its Executive Office of Economic Affairs and its JTPA oversight agencies had reviewed the RTB and found it to be adequate "for the required purpose and desired outcome." *Id.* at p. 3. Finally, Massachusetts submitted a state auditor's report based on a special scope review of Northshore and the RTB.[20] GX 1 at pp. 161-85. For the following reasons, the ALJ concluded that the foregoing documentation was not adequate to overcome the lack of a SAA audit.

The ALJ cited findings from the state auditor's report that cast doubt on the reliability of the RTB and raised additional concerns about Northshore financial management systems. S.D.O.R. at 11-12; *see* GX 1 at pp. 161-85. The state auditor's report identified several deficiencies in Northshore accounting systems, including a "lack of basic accounting controls," that prevented a full, accurate accounting for and reporting of all revenues received and expenses incurred. GX 1 at pp. 172-76. The following findings are relevant to an evaluation of the RTB and the financial management systems

---

[20]    The state auditor's report states that the special scope review was conducted in accordance with generally accepted government auditing standards and encompassed review of Northshore income, disbursements and unpaid liabilitites. GX 1 at pp. 168-69. The report further states that the review was "undertaken to determine whether [Northshore's] income, disbursements, and operating deficits and outstanding liabilities could be accurately established and whether [Northshore's] records could be relied on to adequately support and justify the various transactions processed." *Id.* at pp. 168-69. The special scope review covered "the income received and expenditures made by Northshore Employment Training (NET) for fiscal years 1995 and 1996 and on a limited basis for fiscal year 1994." GX 1 at p. 164.

in place at Northshore during FY 1995.[21] The state auditor concluded that the deficits reported in the RTB for FY 1995 were not accurate, and that the JTPA programs may have incurred deficits rather than having broken even as the RTB stated. GX 1 at p. 174. The state auditor found that "NET did not maintain invoices or other documentation in support of all its expenditures." *Id.* at p. 172. Further, for twenty-three out of seventy-seven FY 1995 expenditures that the auditor reviewed, there were no invoices, contracts or explanation of the purpose of the expenditure in the Northshore records. *Id.* The auditor also found that more than $23,000 of non-JTPA program expenditures by Northshore may have been from JTPA funds. *Id.* at p. 175. The state auditor's report acknowledged that Northshore's failure to maintain an adequate accounting system and to conduct an annual audit violated JTPA regulations at 20 C.F.R. §§ 627.425 and 627.480, as well as Massachusetts Policy Directive (PD) 04-07. *Id.* at pp. 175-76. Finally, the state auditor recommended that an "independent private accountant" be engaged to evaluate the situation and determine what would be necessary to develop credible financial statements for Northshore for FYs 1995 and 1996. *Id.* at p. 176.

### Compliance with the GAAP requirement for financial management systems

Based on the foregoing evidence regarding deficiencies in the RTB and the Northshore financial management system, the ALJ properly concluded that the documentation that Massachusetts had submitted did not establish compliance with two Section 627.425(b) financial system requirements. S.D.O.R. at 12. The first is the Section 627.425(b)(1) requirement that financial systems provide fiscal control and accounting procedures in accordance with generally accepted accounting procedures, or GAAP. As discussed above, Section 627.425(b) of the regulations implemented the amended Section 164(a)(1) requirement "that all financial transactions are conducted and

---

[21]    The ALJ cited one finding from the state auditor's report that is of questionable relevance to his evaluation of the RTB and related documentation that Massachusetts submitted to justify Title II costs for FY 1995. The ALJ cited the state auditor's finding that, prior to the arrival of the consultant who prepared the RTB, Northshore had not properly conducted expense allocations for several years, which was a source of increasing concern to the State Executive Office of Economic Affairs and other state agencies. S.D.O.R. at 11 (citing GX 1 at p. 174). However, the state auditor's report adds that, "[A]lthough the cost allocation process was performed for fiscal year 1995, it was not performed for fiscal year 1996." GX 1 at p.174; *see* GX 1 at p 164. Since the ALJ was evaluating the adequacy of the RTB in connection with the allowability of FY 1995 costs, the auditor's finding that the ALJ cited, when read in context, is of questionable relevance to analysis of the RTB or FY 1995 Northshore financial management. On the other hand, we also note that the state auditor's report contains further findings regarding deficiencies in Northshore financial management in FY 1995, which the ALJ did not include in his discussion. *See* GX 1 at pp. 164-183 *passim*. In his discussion of Title II costs for FY 1996, however, the ALJ did properly quote the state auditor's finding that Northshore performed the cost allocation process for FY 1995 but not for FY 1996. S.D.O.R. at 13.

records maintained in accordance with generally accepted accounting principles applicable in each State." 29 U.S.C.A. § 1574(a)(1) (quoted *supra* at Part I.B.1.). The amended Section 164(a)(1) also required the governor of each state to adopt a particular version of GAAP for application in that state. 29 U.S.C.A. § 1574(a)(1). However, the regulation at Section 627.425(b)(1) specified certain fundamental and generally accepted accounting principles that would be applicable in all states. 20 C.F.R. § 627.425(b)(1) (quoted *supra* at Part. I.B.1.).

Many of the state auditor's findings that the ALJ identified relate directly to the GAAP accounting principles listed in Section 627.425(b)(1). For example, the state auditor stated that, "NET did not maintain invoices or other documentation in support of all its expenditures," and cited the lack of source documentation for twenty-three out of seventy-seven FY 1995 expenditures that the auditor reviewed. GX 1 at p. 172. That finding demonstrates non-compliance with the Section 627.425(b)(1)(iv) requirement for source documentation to support accounting records. The possible use of more than $23,000 in JTPA funds for non-JTPA related programs administered by Northshore clearly fails to demonstrate the "[e]ffective internal controls to safeguard assets and assure their proper use" that Section 627.425(b)(1)(ii) required. *See* GX 1 at p.175.

The ALJ thus properly concluded that the RTB did not comply with the GAAP requirements delineated in Section 627.425(b)(1). Massachusetts contends that the ALJ's analysis is flawed because the version of GAAP that the Governor had approved for use in Massachusetts pursuant to Section 164(a)(1) was not admitted into evidence. Mass. Oct. 13, 2004 brief at 7-8; *see* 29 U.S.C.A. § 1574(a)(1). We reject this contention. The ALJ's reasoning is based on his interpretation of the fundamental GAAP requirements specified in Section 627.425(b)(1), with which we fully concur. As we have discussed, the ALJ properly concluded that, based on the evidence before him, neither Northshore's financial systems nor the RTB complied with the GAAP basics set forth at Section 627.425(b)(1). The Massachusetts version of GAAP would supplement, but not supersede, the GAAP basics specified at Section 627.425(b)(1). *See* 59 Fed. Reg. 45760, 45781 (Pts. 626-631, 637, Final rule) (Sept. 2, 1994); 57 Fed. Reg. 62004, 62012 (Pts. 626-631, 637, Interim final rule) (Dec. 29, 1992). It was thus unnecessary for the ALJ to consider whether the financial systems in place at Northshore, or the State's attempt to improve upon those with the RTB, failed to comply with any further requirements that the State's version of GAAP may have imposed.

Massachusetts also contends that, since the consultant who prepared the RTB reviewed source documentation, the ALJ improperly concluded that the RTB was not prepared in accordance with GAAP. Mass. Oct. 13, 2004 brief at 8; *see* GX 3 at p.8. We reject this contention on various grounds. First, this argument ignores the state auditor's finding that Northshore "did not maintain invoices or other documentation in support of all its expenditures." GX 1 at p.172. This argument also disregards the numerous other deficiencies that the state auditor found in the RTB that relate to the other basic GAAP requirements that are listed at 20 C.F.R. § 627.425(b)(1), which we discussed above. In addition, this contention ignores the State's explanation for why the RTB was prepared,

i.e., that the Lynn SDA was unable to provide a financial status report that was traceable to source documentation and therefore had a consultant prepare the RTB. GX 3 at p. 2.

Finally, Massachusetts argues that the ALJ's reliance on the GAAP requirement violated its procedural due process rights. Specifically, Massachusetts contends that it was not given adequate notice that GAAP was an issue in connection with disallowance of the Title II FY 1995 costs.[22] Mass. Oct. 13, 2004 brief at 7. We reject this contention as wholly without merit. After the ALJ remanded this case to the Grant Officer in April 1999, Massachusetts submitted the RTB and related documentation in lieu of an audit for Title II costs for FY 1995. GX 3, pp. 1-2. In the Revised Final Determination that he issued on November 8, 1999, the Grant Officer addressed the RTB. GX 2, p. 9. The Grant Officer did not cite the financial systems regulation at Section 627.425(b) or expressly refer to the statutory or regulatory GAAP requirement. Id. In fact, the Grant Officer did not cite any regulatory or statutory authority. The Grant Officer did, however, identify a number of deficiencies in the RTB and the Northshore financial system based on the state auditor's report that we discussed above. Among other issues, the Grant Officer noted that Massachusetts had stated in a February 26, 1996 status report to the Regional Administrator for the Department of Labor's Employment and Training Administration that the RTB would be audited by an independent auditing firm. GX 2, p. 9. But, as the Grant Officer further stated, no such audit was conducted. See GX 1, p. 116 (Aug. 5, 1997 ltr. from Mass. Dept. of Empt. and Training to Lynn Mayor McManus); GX 1, p. 186 (Aug. 7, 1996 ltr. from Mass. Dept. of Econ. Development to Lynn Mayor McManus).

Although neither the GAAP requirement nor Section 627.425(b) was specified in the Grant Officer's November 8, 1999 determination, the Grant Officer's determination made clear that the allowability of the Title II FY 1995 costs centered on the question of the adequacy of the financial systems under which the JTPA funds had been expended. GX 2, p. 9. Pursuant to its grant agreement with the Secretary, Massachusetts was required to comply with the statute and regulations. See 20 C.F.R. § 627.200(a)(1);GX 3 at pp. 55-111. When the Grant Officer's Revised Final Determination put Massachusetts on notice of the deficiencies in the RTB and the Northshore financial management system as it pertained to the questioned FY 1995 Title II costs, the Grant Officer effectively put the State on notice that the regulatory requirements at Section 627.425(b) were at issue.

Moreover, the issue of compliance with GAAP was adjudicated at hearing, in connection with the documentation that Massachusetts submitted for both Titles II and III

---

[22]    Massachusetts raises this issue only in connection with the allowability of Title II FY 1995 costs. Mass. Oct. 13, 2004 brief at 7; see id. at 9-17. As the ALJ's initial decision indicates, compliance with GAAP principles was an issue at the hearing in connection with the Title II FY 1996 and Title III FYs 1995 and 1996 costs. See ALJ's Oct. 29, 2001 Dec. and Ord. at 11, 13.

and for FYs 1995 and 1996. The Grant Officer's accounting expert, Dennis Lonergan, testified that there was no indication that the RTB was prepared in accordance with GAAP, and that witness also testified regarding the importance of source documentation to GAAP compliance. HT 30-32, 48, 57-58. (Lonergan).

Furthermore, the questions of whether the RTB was prepared in compliance with GAAP and whether the Northshore financial management systems complied with GAAP were clearly identified as issues regarding the Title II FY 1995 costs when the case was previously before the Board. The Board Decision of Remand noted that the Grant Officer argued the inadequacy of the RTB and related documentation under GAAP. ARB Dec. of Rem. at 6. The ARB decision also cited the GAAP requirement as an example of the financial system requirements in place under the 1992 JTPA amendments, and emphasized that the ALJ should review the specific guidelines for audits required for the particular time period at issue in determining the adequacy of the documentation that Massachusetts had offered in lieu of an audit. ARB Dec. of Rem. at 8-9, 13. If Massachusetts had any concerns about its opportunity to fully respond with evidence and argument regarding the GAAP issue, it could have requested that it be allowed to offer such response when the case was before the ALJ on remand. *Cf. Tritt v. Fluor Constructors,* No. 88-ERA-29, slip op. at 9-10 (Sec'y Mar. 16, 1995) (holding that employer's lack of opportunity to cross-examine witness regarding compensatory damages claim was cured by opportunity to cross-examine witness in hearing on remand).

We also reject Massachusetts's reliance on *Wyoming v. Alexander,* 971 F.2d 531 (10th Cir. 1992). In that case, the Department of Education had disputed the allowability of certain grant expenditures by the State of Wyoming based on whether disadvantaged students, rather than handicapped students as intended by Education, were served by the funded programs. 971 F.2d at 541-42. When the case reached the Education Appeal Board (EAB), that body raised the issue of whether Wyoming had operated the program under the excess cost standard or the full cost standard. *Id.* at 542. The EAB then held that Wyoming could not prevail because it had not submitted evidence relevant to the cost approach that it had used. *Id.* The United States Court of Appeals held that Wyoming had not been provided a meaningful opportunity to present evidence and argument regarding the cost approach used, as required by the Administrative Procedure Act, 5 U.S.C.A. § 554(b)(3). *Id.* at 542-43. The court concluded that notice to Wyoming that the type of student served by the program was at issue did not provide Wyoming adequate notice that the cost approach used was also at issue. *Id.* The court therefore vacated the EAB's decision against Wyoming and remanded the case to Education to provide the state an opportunity to present evidence and argument on the cost approach question. *Id.* at 543.

In contrast, Massachusetts has had a full and fair opportunity to litigate the determinative question regarding the allowability of Title II costs for FY 1995. That question – whether Massachusetts submitted documentation that demonstrated that the Title II costs were disbursed and accounted for in compliance with JTPA requirements, including the statutory and regulatory GAAP requirement – was fully litigated before the

ALJ. Even after the question was further focused by this Board's remand directive, Massachusetts was given an additional opportunity to request that it be allowed to offer evidence and argument regarding the specific question of GAAP compliance under Section 627.425(b)(1), on remand before the ALJ. We therefore reject Massachusetts's reliance on the *Wyoming* case as misplaced.

### Compliance with the "permit the tracing of funds" requirement

The ALJ also properly concluded that the $4,861,178 in costs had not been expended in compliance with the Section 627.425(b)(2) requirement that a subrecipient's financial records be capable of providing certain information for reports or investigations. Section 627.425(b)(2)(i)-(ii) implements the Section 165(a)(1) requirement that recipients keep records that are sufficient to permit the preparation of required reports and to permit the tracing of funds to a level of expenditure adequate to establish that such funds had not been used in violation of the applicable restrictions on the use of those funds. 20 C.F.R. § 627.425(b)(2)(i),(ii) (quoted *supra* at Part I.B.1.); *see also* 29 U.S.C.A. § 1575(f) (requiring subgrantees to provide quarterly financial reports to the governor). According to Section 627.425(b)(2)(i), (ii), Northshore's financial systems should have provided the information that would permit the preparation of required reports and the tracing of funds to a level adequate to establish that the funds had not been used in violation of applicable JTPA restrictions. The ALJ's finding that Massachusetts had failed to demonstrate that Lynn's financial systems were adequate under Section 627.425(b)(2) is supported by the numerous deficiencies in Northshore financial management generally, and in the RTB specifically, that were cited in the state auditor's report, GX 1 at pp. 161-85. As the ALJ discussed, the state auditor's report effectively acknowledges that Northshore's financial management system did not permit the preparation of reports or the tracing of funds necessary under Section 627.425(b)(2). *See* GX 1 at pp. 162-85.

### 3. Conclusion

Thus, since Massachusetts did not present cogent evidence and argument that Lynn met the fiscal control and record-keeping requirements of the JTPA or that Massachusetts had otherwise compensated for deficiencies in Lynn's financial systems, we agree with the ALJ that Massachusetts failed to establish a basis for overturning the Grant Officer's disallowance of $4,861,178 in Title II costs for FY 1995.

## B. Title II FY 1996

### 1. Summary of the ALJ's findings

The ALJ's determination regarding the Grant Officer's disallowance of Title II funds for FY 1996 remained unchanged on remand. The ALJ re-examined the Grant Officer's disallowance of $2,080,188 in Title II costs for FY 1996 under the pertinent statutory and regulatory provisions on remand and concluded that the disallowance should be upheld. S.D.O.R. at 13; *see* ALJ's Oct. 29, 2001 Dec. and Ord. at 19. Similar to his determination regarding the Title II funds for FY 1995 discussed above, the ALJ

found that Massachusetts had failed to provide documentation adequate to overcome the lack of an SAA audit for Lynn for FY 1996. S.D.O.R. at 13. The ALJ therefore concluded that Massachusetts failed to establish that the $2,080,188 in Title II funds had been expended in compliance with JTPA fiscal control and record-keeping requirements. *Id.* As the ALJ noted in analyzing the allowability of Title II funds for FY 1995, such non-compliance amounts to the misexpenditure of funds. S.D.O.R. at 9 (citing *Louisiana v. United States Dep't of Labor,* 108 F.3d 614, 618 (5th Cir. 1997); *Montgomery County v. Dep't of Labor,* 757 F.2d 1510, 1513 (4th Cir. 1985) (arising under CETA); *City of Oakland v. Donovan,* 703 F.2d 1104, 1107 (9th Cir.), *modified,* 707 F.2d 1013 (9th Cir. 1983) (also arising under CETA)).

### 2. The lack of an SAA audit

As he had for FY 1995, the ALJ properly determined that Lynn was subject to the requirement for an annual SAA audit for FY 1996, pursuant to 20 C.F.R. § 627.480(a) and 29 C.F.R. Pt. 96. S.D.O.R. at 9-10. The ALJ also found that Lynn had not conducted an SAA audit for FY 1996. *Id.* at 10.[23] The ALJ determined that the lack of an SAA audit supported a prima facie finding of misspent funds under Title II for FY 1996 based on Lynn's failure to maintain accurate and reliable records sufficient to permit the tracing of funds to insure that the funds had not been spent unlawfully. *Id.* at 10-11. In reaching that conclusion, the ALJ cited the Grant Officer's testimony regarding the importance of an SAA audit. *Id.* As discussed above in connection with Title II costs for FY 1995, the Grant Officer testified that an SDA's financial records must demonstrate compliance with three basic restrictions on the use of JTPA funds: cost principles, cost classifications and limitations on certain costs. *Id.* (citing 20 C.F.R. §§ 627.435, 627.440, 627.445). The Grant Officer explained how an audit demonstrates whether or not the expenditures complied with such restrictions, and thus permits the tracing of funds to the level of expenditure necessary to ensure that the funds have not been unlawfully spent. HT at 140-49, 175-78 (Salgado).

### 3. The documentation that Massachusetts submitted to overcome the lack of an audit

Massachusetts submitted weekly invoice documentation to demonstrate that $1,827,340 in Title II funds for FY 1996 should be allowed because they were expended in compliance with the Act. GX 3 at pp. 3, 29-723. The "weekly invoices" and related documents were generated because of procedures that Massachusetts put in place in FY 1996, after it had detected problems with Northshore's financial systems in FY 1995. GX 3 at p. 3. This additional documentation was developed to aid the State in estimating the amount of Title II funds that Northshore needed weekly to fund its operations, and to disburse only those amounts to Northshore each week. *Id.* The State initially required Northshore to provide documentation before releasing Title II funds. GX 3 at p. 3; HT

---

[23] *See* n.17 *supra* regarding Massachusetts's audit argument concerning Title III funds.

406-12 (Manning). Later in the fiscal year, Massachusetts required Northshore to provide documentation regarding the use of such funds afterwards as well as before the cash advances were made. GX 3 at p. 3; HT 406-12 (Manning); *see* HT 465-67, 469-71 (Sweeney). In addition, personnel from the State JTPA program director's office made on-site inspections of the Northshore operation and actually reviewed payroll time sheets, verified vendor checks against bank statements and occasionally contacted vendors to ensure that they had received checks from Northshore. HT 450-54 (Sweeney). [24]

Lonergan, the Grant Officer's expert witness, testified that he viewed the weekly invoice documentation as inadequate to support allowance of $1,827,340 in Title II funds for FY 1996. As the ALJ found, Lonergan testified "without contradiction" that the weekly invoice documentation lacked source documentation such as invoices and checks to establish how the funds, after the State's disbursal to Northshore, were expended. HT 41-51, 122, 127-28 (Lonergan); *see* S.D.O.R. at 13. He explained that the weekly invoice documentation contained records regarding Northshore's requests for Title II fund releases from the State and the State's disbursals, but the documentation did not contain records to establish the ultimate distribution of those funds by Northshore. *Id.* The witness testified that the weekly invoice documentation thus did not meet GAAP requirements. HT 47-48 (Lonergan).[25]

---

[24]    Massachusetts also submitted participant data for Title II programs for FY 1995 and 1996, GX 3 at pp. 3, 725-54. The Grant Officer testified that this information concerned program performance but was not linked to any particular costs and thus did not contribute to demonstrating the allowability of costs. HT 145-48 (Salgado). Although a State JTPA oversight officer testified that state personnel also monitored participant eligibility data on file at Northshore, she acknowledged that state staff did not review the eligibility of participants in connection with particular expenditures for Title II in FY 1996. HT 473-75 (Sweeney). She also acknowledged that performance statistics do not provide the documentation necessary to support the allowability of costs. HT 478-81 (Sweeney). It was thus unnecessary for the ALJ to evaluate the participant and program performance data that was submitted.

[25]    Massachusetts points out two arguable weaknesses in the testimony of the Grant Officer's expert accounting witness, Lonergan. Massachusetts cites two instances in which the witness recanted or modified his testimony regarding discrepancies in the weekly invoice documentation on cross-examination. Mass. Oct. 13, 2004 brief at 10-12; *see* HT 41, 86-87. The ALJ addressed both these credibility issues in his initial decision. ALJ's Oct. 29, 2001 Dec. and Ord. at 11. The ALJ's discussion in the initial decision and his subsequent crediting of this witness's testimony on various points indicates that he did not find that these weaknesses in Lonergan's testimony undermined the probative value of his testimony on other issues. *Id.* at 11, 19. As the presiding officer at the hearing, the ALJ has the opportunity to observe the witnesses and assess their credibility based on those observations. Although the Board reviews the evidence de novo and is otherwise not bound by the ALJ's crediting of witness testimony, we do not reverse the ALJ's evaluation of witness testimony unless it is clearly erroneous. *See Jenkins v. United States Envtl. Prot. Agency,* ARB No. 98-

Continued. . .

The state auditor's report, discussed above in connection with Title II costs for FY 1995, also covered Northshore financial systems for FY 1996. GX 1 at p. 164. The ALJ cited the following findings that are relevant to Northshore financial systems for FY 1996. S.D.O.R. at 13. The state auditor found "deficiencies in Northshore's accounting system and its lack of basic accounting controls" that prevented Northshore from completely and accurately accounting for and reporting revenues and expenses. Northshore had therefore been precluded from producing a balance sheet or an income and expense statement "throughout the entire" FY 1996. GX 1 at pp. 162, 172. The auditor also found that Northshore "did not maintain invoices or other documentation in support of all its expenditures." *Id.* In addition, Northshore did not perform the cost allocation process for FY 1996. *Id.* at p. 174. The state auditor also found that funds from the retail stores that Northshore operated had been used to pay substantial amounts for expenses that appeared to be related to JTPA programs. *Id.* at p. 173.

### *Compliance with the GAAP requirement for financial management systems*

As discussed above, Section 627.425(b)(1) implemented the statutory GAAP requirement "that all financial transactions are conducted and records maintained in accordance with generally accepted accounting principles applicable in each State." 29 U.S.C.A. § 1574(a)(1) (quoted *supra* at Part I.B.1.). As also discussed above, Section 627.425(b)(1) specified fundamental generally accepted accounting principles to be applied in all states. 20 C.F.R. § 627.425(b)(1) (quoted *supra* at Part I.B.1.). The ALJ determined that the weekly invoice documentation was not prepared in accordance with GAAP, based on the evidence provided by the Grant Officer's expert accounting witness and the state audit report. S.D.O.R. at 13. The ALJ's conclusion is fully supported by the cited evidence, which concerns the following Section 627.425(b)(1) GAAP requirements.

First, the evidence of incomplete source documentation that the state auditor found in Northshore accounting records and the complete lack of source documentation in the weekly invoice documentation that the Grant Officer's expert witness cited both relate to the Section 627.425(b)(1)(iv) requirement that source documentation be included in the subrecipient's financial system. In addition, Northshore's failure to perform cost allocations for FY 1996 represents non-compliance with the Section 627.425(b)(1)(v) requirement for proper charging of costs and cost allocation. Furthermore, the other state auditor's findings that the ALJ cited cast doubt on whether Northshore's financial system contained all the types of information that Section 627.425(b)(1)(i) required or the effective internal controls to safeguard assets and assure their proper use that Section 627.425(b)(1)(ii) required. *See* 20 C.F.R. § 627.425(b)(1) (quoted *supra* at Part I.B.1.).

---

146, ALJ No. 88-SWD-2, slip op. at 9 (ARB Feb. 28, 2003). There is no basis for reversing the ALJ's crediting of Lonergan's testimony here.

Massachusetts contends that the ALJ erred in applying the Section 627.425(b)(1)(iv) source documentation requirement. Specifically, Massachusetts urges that the ALJ should have accepted the testimony of State JTPA oversight personnel that they had reviewed source documentation at the Northshore site rather than requiring that the source documentation be submitted. In support of this contention, Massachusetts cites the Section 627.425(b)(1)(iv) requirement that the State ensure that the subrecipient retains source documentation to support accounting records. Mass. Oct. 13, 2004 brief at 12-13. We reject this contention. In this case, Massachusetts has been provided an opportunity to compensate for the Lynn SDA's non-compliance with JTPA and SAA audit requirements. To overcome the lack of an audit, Massachusetts must submit documentation that provides the information necessary to determine whether costs comply with the various restrictions that the JTPA imposes. *See* ARB Dec. of Rem. at 10 n.7, 13. To determine what documentation should be submitted in the absence of an audit to facilitate a determination regarding the allowability of costs, we look to JTPA financial management and record-keeping and audit requirements. *See id.* We are thus looking to Section 627.425 as a guide to determine the adequacy of the documentation that Massachusetts has *submitted* in lieu of an audit.

### Compliance with the "permit the tracing of the funds" requirement

The ALJ also concluded that the weekly invoice documentation did not comply with the requirements of Section 627.425(b)(2). S.D.O.R. at 13. That conclusion is also well-supported by the evidence. As discussed in the Title II FY 1995 costs analysis above, Section 627.425(b)(2)(i)-(ii) implements the Section 165(a)(1) requirement that recipients keep records that are sufficient to permit the preparation of required reports and to permit the tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of applicable restrictions. 20 C.F.R. § 627.425(b)(2)(i), (ii) (quoted *supra* at Part I.B.1.); *see also* 29 U.S.C.A. § 1575(f) (requiring subgrantees to provide quarterly financial reports to the governor). Pursuant to Section 627.425(b)(2)(i), (ii), SDA records should provide the information necessary for the preparation of required reports and for the tracing of funds to a level adequate to establish that the funds have not been used unlawfully. The Grant Officer's testimony and that of his expert accountant support the ALJ's conclusion that the weekly invoice documentation is not adequate to permit preparation of required reports or to permit the tracing of funds to the necessary level of expenditure.

Those witnesses testified regarding the information that must be provided to demonstrate that a cost complies with the various restrictions imposed on the use of JTPA funds.[26] Lonergan testified that the weekly invoice documentation did not provide

---

[26]    The ALJ also found the weekly invoice documentation to be "unauditable." S.D.O.R. at 13; ALJ's Oct. 29, 2001 Dec. and Ord. at 19; *see Montgomery County v. Dep't of Labor,* 757 F.2d 1510, 1512 (4th Cir. 1985) (certified public accountant's description of grantee's records that contained neither a chart of accounts or a general ledger and in which it was

Continued. . .

adequate information to determine the allowability of the costs addressed. Lonergan emphasized that proper substantiation of the purpose of the expenditure in the form of source documentation was critical to determining whether to allow the costs. HT 41-51, 122, 127-28 (Lonergan). The Grant Officer explained that the SDA's financial records must demonstrate compliance with basic restrictions on the use of JTPA funds, including cost principles, cost classifications and limitations on certain costs. HT 140-49, 175-78; *see* S.D.O.R. at 9-10 (citing 20 C.F.R. §§ 627.435, 627.440, 627.445). This testimony regarding the extensive information that should be maintained by the SDA, along with the critical deficiencies in Northshore financial management in FY 1996 that the state auditor's report identified, supports the ALJ's conclusion that the weekly invoice documentation was inadequate under Section 627.425(b)(2).

### 4. Conclusion

Thus, since Massachusetts did not present cogent evidence and argument that Lynn met JTPA fiscal control and record-keeping requirements or that Massachusetts compensated for deficiencies in Lynn's financial systems, the ALJ properly found that Massachusetts had failed to provide a basis for overturning the Grant Officer's disallowance of $2,080,188 in Title II FY 1996 costs.

## C. Title III FYs 1995 and 1996

### 1. Summary of the ALJ's findings

On remand, the ALJ did not change his earlier conclusion that the Grant Officer's disallowance of Title III funds for FYs 1995 and 1996 should be upheld. S.D.O.R. at 13-15; *see* ALJ's Oct. 29, 2001 Dec. and Ord. at 19. At issue before the ALJ was the Grant Officer's disallowance of $1,970,288 in Title III funds for the two fiscal years. GX 3 at pp. 5-6. Of that amount, Massachusetts conceded that $325,113 should be disallowed. ALJ's Oct. 29, 2001 Dec. and Ord. at 16; *see* Mass. Oct. 13, 2004 brief at 17. Massachusetts thus continued to assert that $1,645,175 in Title III costs were allowable. As with the Title II costs, the ALJ concluded that Lynn had not conducted an SAA audit, and that Massachusetts had failed to provide documentation that was adequate to overcome that omission. S.D.O.R. at 13-15. The ALJ thus concluded that Massachusetts failed to establish that the Lynn SDA had complied with the JTPA fiscal control and record-keeping requirements in expending the contested Title III funds for FYs 1995 and 1996. As discussed in the Title II costs analyses above, such non-compliance amounts to the misexpenditure of grant funds. *See Louisiana v. United States Dep't of Labor,* 108 F.3d 614, 618 (5th Cir. 1997); *Montgomery County v. Dep't of Labor,* 757 F.2d 1510, 1513 (4th Cir. 1985) (arising under CETA); *City of Oakland v. Donovan,* 703 F.2d 1104, 1107 (9th Cir.), *modified,* 707 F.2d 1013 (9th Cir. 1983) (also arising under CETA)).

---

impossible to relate individual checks written by the grantee with the costs that the grantee alleged as allowable).

The ALJ therefore upheld the Grant Officer's disallowance of $1,645,175 in Title III costs for FYs 1995 and 1996. S.D.O.R. at 15.

### 2. The Grant Officer's concession regarding $182,605 in Title III costs

The parties contend that the ALJ erroneously re-examined on remand the disallowance of $182,605 in Title III costs that the Grant Officer had effectively conceded to be allowable. Mass. Oct. 13, 2004 brief at 16; Grant Ofcr. Nov. 15, 2004 brief at 16-17. We agree. The ALJ had found in his initial decision that the $182,605 in costs should be allowed. ALJ Oct. 29, 2001 Dec. and Ord. at 19. When the case was appealed to the Board, the Grant Officer did not challenge the ALJ's finding regarding the allowability of those Title III costs. ARB Dec. of Rem. at 6 (citing Grant Ofcr. Pet. for Rev. at 2 n.1). On remand, however, the ALJ improperly included the $182,605 in Title III costs in his analysis and determined that the $182,605 in costs should be disallowed. S.D.O.R. at 14-15; *see id.* at 9 n.10. We therefore reverse the ALJ's Title III finding on remand disallowing the $182,605 in costs.

### 3. The lack of an SAA audit and the testimony regarding the state agency audit

As already discussed in connection with the Title II costs, the ALJ properly determined that Lynn was required to conduct an SAA audit for FYs 1995 and 1996. S.D.O.R. at 9-10; *see* 20 C.F.R. § 627.480(a); 29 C.F.R. Pt. 96. As discussed above, the ALJ properly found that Lynn did not conduct an SAA audit for FYs 1995 and 1996, and he further concluded that such non-compliance with JTPA requirements supported the Grant Officer's prima facie case of "misspent" funds. S.D.O.R. at 10-11. With regard to the Title III costs that are at issue, Massachusetts contended that a FY 1996 audit of its state agency that was responsible for Title III oversight should be accepted in lieu of a FY 1996 SAA audit for Lynn. GX 3 at pp. 4-5.

Elizabeth Durkin, from the Massachusetts Industrial Services Program, later renamed the Corporation for Business, Work and Learning (CBWL/ISP), testified that documentation from Northshore's Title III program that was contained in CBWL/ISP records was included in an FY 1996 audit of that agency. HT 333-34, 350-56, 358, 369-71 (Durkin); *see* S.D.O.R. at 13-14. As the ALJ recounted, the CBWL/ISP assumed full responsibility during FY 1995 for operation of some Title III programs that Northshore had administered, and engaged in extensive oversight of other Northshore Title III programs. S.D.O.R. at 13-14; GX 3 at p. 4; HT 320-31 (Durkin). From March 1995 until Northshore closed in June 1996, CBWL/ISP tightened its restrictions on disbursements of Title III funds to Northshore.[27]    S.D.O.R. at 13-14; GX 3 at pp.4-5; *see* HT 320-31

---

[27]    We note that March 1995 is nine months into Massachusetts FY 1995 (July 1, 1994– June 30, 1995) and that June 1996 is the last month in Massachusetts FY 1996 (July 1, 1995– June 30, 1996). *See* n.9 *supra*.

(Durkin). In addition to maintaining records of Northshore's funds requests and CBWL/ISP's disbursements, CBWL/ISP staff made on-site visits to Northshore to review source documentation related to Northshore's expenditure of the funds that CBWL/ISP had disbursed. S.D.O.R. at 13-14; HT 324-30 (Durkin). Durkin testified that the documentation that CBWL/ISP had retained regarding its disbursements to Northshore and supporting documentation regarding Northshore expenditures was included in an independent audit of CBWL/ISP. S.D.O.R. at 14; HT 333-34 (Durkin). However, as the ALJ also noted, Durkin further testified that the CBWL/ISP staff had copied "only a sampling" of Northshore records substantiating Northshore's expenditure of these funds during on-site visits. S.D.O.R. at 14; HT 346-51 (Durkin). Moreover, although Durkin received a copy of the auditor's CBWL/ISP report for FY 1996, Massachusetts did not submit the report to the Grant Officer or at hearing. *Id.;* HT 334, 369-71 (Durkin).

We agree with the ALJ's conclusion that the CBWL/ISP audit does not qualify, for purposes of establishing the allowability of the contested Title III costs, as an acceptable substitute for the SAA audit under OMB Circular A-128 that Lynn was required to conduct. S.D.O.R. at 15. An auditor must meet a wide range of requirements in conducting an audit in compliance with Circular A-128. 29 C.F.R. Pt. 96, App. A, OMB Circ. A-128; *see* discussion *supra* at Part I.B.1. Durkin's testimony does not provide the information necessary to conclude that those requirements were met. For example, Durkin testified that CBWL/ISP records contained documentation regarding its disbursements to Northshore, but contained only incomplete source documentation regarding Northshore transactions. HT 346-51 (Durkin). Circular A-128 requires the auditor to review the auditee's internal controls and compliance with major federal assistance programs. 29 C.F.R. Pt. 96, App. A, ¶ 8. As the ALJ indicated, Durkin's testimony does not explain how the auditor could have rendered a determination regarding Northshore's internal controls and the SDA's compliance with JTPA cost restrictions based on the documentation that was available at CBWL/ISP. S.D.O.R. at 15. Moreover, Massachusetts did not submit the CBWL/ISP audit report to the Grant Officer or offer it for admission at hearing. *Id.;* HT 334, 369-71 (Durkin). Pursuant to OMB Circular A-128, a copy of an audit report must be submitted to the grantor agency. 29 C.F.R. Pt. 96, App. A, ¶ 13f. We accordingly agree with the ALJ that the Grant Officer demonstrated that the Lynn SDA had failed to comply with the JTPA audit requirement, for the purposes of Titles II and III expenditures, for both of the fiscal years that are at issue.

### 4. The documentation that Massachusetts submitted to overcome the lack of an audit

To support its position that only $325,113 of the $1,970,288 in Title III costs that the Grant Officer disallowed were proper, Massachusetts cited a CBWL/ISP analysis of Northshore's Title III costs for FYs 1995 and 1996. GX 3 at p. 4; *see* GX 2 at p. 10. Massachusetts stated that CBWL/ISP reached the $325,113 figure as "the result of an analysis of the reconciliation of expenditures and cash which [Northshore] performed for FY '95 and the cash requests and fiscal status reports submitted to CBWL/ISP versus the amount of cash released to [Northshore] during FY '95 and FY '96." GX 3 at p. 4.

Massachusetts also stated that the $325,113 in misexpenditures arose in Northshore operations for FY 1995. GX 3 at p. 5. Massachusetts asserted that no costs were to be disallowed for FY 1996, because "CBWL/ISP released cash to [Northshore] only for those expenses that could be directly charged to Title III grants and for which CBWL/ISP staff were able to review substantiating documentation." *Id.* Massachusetts submitted copies of the monthly fiscal status reports cited above and the Northshore cash requests and CBWL/ISP disbursal records. GX 2 at pp. 21-365; *see* GX 3 at p 4. As the ALJ noted, however, Massachusetts failed to submit a copy of the CBWL/ISP analysis or the Northshore reconciliation of expenditures and cash for FY 1995 on which the CBWL/ISP analysis was also based. S.D.O.R. at 14; *see* GX 2 at p. 10.

In addition, as the ALJ discussed, the Grant Officer's accounting expert Lonergan testified that he had reviewed the fiscal status reports and related documentation but, for the following reasons, found it inadequate to support the $325,113 disallowance figure that CBWL/ISP had reached. First, Lonergan explained that, because the documentation did not include a summary or recap sheet, he could not determine which fiscal status report covered a particular cash request that Northshore submitted to CBWL/ISP or a particular check that CBWL/ISP disbursed to Northshore. HT 56-58 (Lonergan); *see* S.D.O.R. at 14. Lonergan also testified that the documentation did not comply with GAAP because it lacked source documentation to substantiate the purposes for which Northshore actually spent the funds that CBWL/ISP disbursed. HT 57-59 (Lonergan); *see* S.D.O.R. at 14; *see also* HT 346-51 (Durkin, testifying regarding the different approaches that CBWL/ISP took to reviewing "back-up documentation" at the Northshore site, and indicating that CBWL/ISP obtained copies of only a sampling of such documentation).

Massachusetts also submitted documentation, in the form of two payables sheets with copies of checks to support some of the transactions listed, to support the allowance of payments that Northshore made to vendors. GX 2 at pp. 366-535; GX 4 at pp. 1, 87; *see* GX 3 at p. 6. In addition, Massachusetts submitted documentation to support the allowance of payments that CBWL/ISP made directly to vendors that had provided Northshore services, including copies of checks and other documentation to support some transactions.[28] GX 2 at pp. 429-35; GX 4 at pp. 227-70; *see* GX 3 at p. 5; HT 335-36

---

[28]    This and the preceding category of documentation – the two lists of payables – contain documents regarding the four amounts that comprise the $182,605 in Title III costs that the Grant Officer no longer contests. *See* Grant Ofcr. Nov. 15, 2004 brief at 15-17; S.D.O.R. at 14-15; discussion at pt. II.C.2. Those amounts are as follows:   $8,682 that CBWL/ISP paid directly to training vendors Clark University and Boston Electrology Center, GX 4 at pp. 227-70; $24,000 that CBWL/ISP paid directly to training vendor Computer Career Center, GX 2 at pp. 429-35; HT 335-36 (Durkin); $60,750 from payables list number 1 that Northshore paid to training vendors in FY 1996, GX 4 at p. 1; and $89,173 from payables list number 2 that Northshore paid to training vendors in FY 1995, GX 4 at p. 87. We need not discuss the ALJ's analysis of the documentation that Massachusetts submitted

Continued. . .

(Durkin). Massachusetts submitted further documentation to support allowance of expenses that CBWL/ISP incurred in closing the Northshore facility. The claimed costs included payments CBWL/ISP made to vendors that Northshore had not paid before the closure and expenses arising from the CBWL/ISP staff's re-opening of the Northshore offices to pack and move records, equipment and supplies. GX 2 at pp. 366-535; *see* GX 3 at pp. 5-6.

As the ALJ discussed, the Grant Officer's expert accounting witness testified regarding deficiencies that he found when he reviewed this documentation. S.D.O.R. at 14. With regard to the two payables lists, Lonergan testified that Massachusetts had not provided source documentation such as invoices and checks to substantiate some of the payments listed. HT 62-64 (Lonergan). Lonergan testified that Massachusetts had also failed to provide source documentation for payments that CBWL/ISP made directly to vendors, both before and after the Northshore closure. HT 65-68 (Lonergan). In addition to the lack of source documentation, Lonergan testified that the documentation provided did not establish compliance with the various JTPA restrictions on costs. HT 63-73 (Lonergan). Regarding the costs that Massachusetts claimed for closing the Northshore offices, Lonergan testified that the documentation did not contain a summary sheet distinguishing the expenses that were incurred in closing those offices from the expenses related to CBWL/ISP's direct operation of the JTPA program. HT 70-71 (Lonergan). Further, Lonergan testified that the documentation did not indicate the source of the funds that CBWL/ISP used, and he questioned the manner in which CBWL/ISP had allocated the costs. HT 71-72 (Lonergan). Finally, Lonergan objected to the time sheets for CBWL/ISP personnel that Massachusetts had submitted, testifying that it was unclear how CBWL/ISP had calculated costs based on those records. HT 72-73 (Lonergan); *see* GX 3 at pp. 755-82.

### Compliance with the GAAP requirement for financial management systems

As with the documentation offered to support allowance of the Title II costs discussed above, the ALJ found that the documentation that Massachusetts submitted to support allowance of the Title III costs failed to comply with the Section 164(a)(1) GAAP requirement that is implemented by Section 627.425(b)(1). S.D.O.R. at 15; *see* 29

---

to support this $182,605 in Title III costs that are no longer at issue. Although the Grant Officer has not provided a reason for withdrawing his objection to the allowance of these costs, we note that the $182,605 in costs are those for which Massachusetts provided copies of checks and other source documentation to substantiate the transactions. HT 62-68 (Lonergan); GX 2 at pp. 429-35; GX 4 at pp. 1, 87, 227-70; *see* S.D.O.R. at 14-15; ALJ's Oct. 29, 2001 Dec. and Ord. at 14-15; GX 2 at p. 11; *see* 20 C.F.R. § 627.425(b)(1)(iv). We also note that these costs are for training, the one category of costs over which Title III does not impose a cap but instead requires a minimum expenditure of fifty percent of program funds. *See* GX 2 at pp. 429-35; GX 4 at pp. 1, 87, 227-70; 20 C.F.R. § 631.14(a).

U.S.C.A. § 1574(a)(1) (quoted *supra* at Part I.B.1.); 20 C.F.R. § 627.425(b)(1) (1994-96) (quoted *supra* at Part I.B.1.). The ALJ's conclusion is supported by the relevant evidence. As Lonergan testified, the submitted documentation lacks source documentation such as checks and invoices to substantiate transactions.[29] GX 2 at pp. 21-535; GX 4 at pp. 227-70. Although Durkin testified generally regarding CBWL/ISP staff review of checks and invoices at Northshore, such testimony is inadequate to demonstrate that the questioned costs were expended in compliance with fiscal control and accounting procedures that comply with GAAP. As we discussed in the Title II costs analysis above, Massachusetts has been provided an opportunity to demonstrate the allowability of the questioned costs despite the lack of a proper audit of the Lynn SDA. To succeed, Massachusetts must submit documents containing the information necessary to demonstrate that the costs were actually expended as claimed, and the testimony offered here does not provide an acceptable substitute for the reliability and detail that checks and invoices provide. The ALJ thus properly found that the documentation did not comply with the Section 627.425(b)(1)(iv) source documentation requirement.

As the ALJ explained, the Title III documentation is also inadequate in that it does not indicate that the costs were allocated to the proper cost classifications. S.D.O.R. at 15; *see* 29 U.S.C.A. §§ 1518(a), 1661c(a); 20 C.F.R. §§ 627.440(a), 631.313(a)(2). Pursuant to Section 627.425(b)(1)(v), financial systems must comply with the basic GAAP requirement for the proper charging and allocation of costs. 20 C.F.R. § 627.425(b)(1)(v) (quoted *supra* at Part I.B.1.). As Lonergan testified, the documentation for the costs related to CBWL/ISP's closing of the Northshore offices does not contain a summary sheet to distinguish the expenses that were incurred in closing those offices from the expenses related to CBWL/ISP's direct operation of the JTPA program. GX 3 at pp. 755-82; HT 70-72 (Lonergan). In addition, the documentation for the Northshore closing costs did not indicate the source of the funds that CBWL/ISP used. GX 2 at pp. 366-535; *see* HT 71-72 (Lonergan). Both these deficiencies relate to the proper charging and allocation of costs, at either the state or SDA level. We thus agree with the ALJ that the Title III documentation fails to meet the Section 627.425(b)(1) requirement for GAAP compliance.

### Compliance with the "permit the tracing of the funds" requirement

The ALJ also properly concluded that the Title III documentation did not comply with the Section 165(a)(1) requirement, implemented at Section 627.425(b)(2)(ii), that the subrecipient's financial system "[p]ermit the tracing of funds to a level of expenditure adequate to establish that funds have not been used in violation of the applicable restrictions on the use of such funds." S.D.O.R. at 15; *see* 29 U.S.C.A. § 1575(a)(1) (quoted *supra* at Part I.B.1.); 20 C.F.R. § 627.425(b)(2)(ii) (quoted *supra* at Part I.B.1.).

---

[29]     In the interest of clarity, we reiterate that the documentation for the costs totaling $182,605 that are no longer at issue and which did include source documentation, is not included in this analysis. *See* n.27 *supra*.

As discussed above in the Title II costs analyses, the allowability of these costs hinges on whether Massachusetts has demonstrated that the costs were expended in compliance with various JTPA restrictions, including compliance with cost principles, cost classifications and limitations on certain costs. *See* S.D.O.R. at 9-10 (citing 20 C.F.R. §§ 627.435, 627.440, 627.445). The ALJ credited Lonergan's testimony that the Title III documentation did not provide the information necessary to establish compliance with the foregoing restrictions. S.D.O.R. at 14-15. We have reviewed those documents and find that they support Lonergan's testimony. GX 2 at pp. 21-535; GX 3 at pp. 755-82; GX 4 at pp. 227-70.

### 5. Conclusion

Therefore, since Massachusetts did not submit cogent evidence and argument that Lynn met specific JTPA fiscal control and record-keeping requirements or that Massachusetts had otherwise compensated for deficiencies in Lynn's financial systems, we agree with the ALJ that Massachusetts failed to establish a basis for overturning the Grant Officer's disallowance of $1,645,175 in Title III costs for FYs 1995 and 1996.[30]

## III. Eligibility for waiver of liability for repayment of disallowed costs

### A. Summary of the ALJ's findings and the relevant authorities

Section 164(e) authorizes the Secretary to waive a grant recipient's liability for repayment of misexpended funds. 29 U.S.C.A. § 1574(e). Section 164(e)(1) prohibits a waiver, however, in cases in which the misexpenditure was due to "willful disregard of the requirements of this Act, gross negligence, or failure to observe accepted standards of administration." 29 U.S.C.A. § 1574(e)(1); 20 C.F.R. § 627.704(c)(2) (1996-97);[31] *see Ariz. Dep't of Econ. Sec. v. United States Dep't of Labor*, ARB No. 96-036, ALJ No. 94-JTP-18, slip op. at 5-10 (ARB June 7, 1996). If those aggravating factors are not present and the misexpenditures are the result of a subrecipient's violations of the Act, a recipient may establish eligibility for a waiver of liability by demonstrating that it has "substantially complied" with four recipient obligations that are contained in Section 164(e)(2)(A)-(D). 29 U.S.C.A. § 1574(e)(2)(A)-(D) (quoted *supra* at Part I.B.2.). The provisions of Section 164(e)(1)-(3) are implemented at 20 C.F.R. § 627.704 (quoted *supra* at Part I.B.2.). As the ALJ properly summarized, the purpose of Section 164(e) is

---

[30]    This amount reflects a deduction of $182,605 for the Title III costs that the Grant Officer is no longer pursuing. *See* n.27 *supra.*

[31]    *See* n.15 *supra* regarding the changes to the text and designation of the provisions of Section 627.704 that were implemented in the final Part 627 regulations that were issued December 29, 1994. As the ALJ stated, the textual differences between the interim regulation at Section 627.704 and the final Section 627.704 regulation are not relevant to the issues in this case. S.D.O.R. at 17 n.18.

to permit the Secretary to waive a recipient's liability when the recipient was unable to prevent the subrecipient's violations of the Act, despite the recipient's establishment of proper oversight standards and diligent adherence to those standards. S.D.O.R. at 15 (citing *Comm'r, Employment Sec. v. United States Dep't of Labor,* Nos. 90-JTP-29, 91-JTP-11, 92-JTP-34, slip op. at 4-5 (Sec'y Sept. 13, 1995)).

In his initial decision, the ALJ concluded that Massachusetts had not established that it was eligible for a waiver. ALJ's Oct. 29, 2001 Dec. and Ord. at 20-21. Specifically, the ALJ found that Massachusetts failed to establish substantial compliance with one of the four obligations set forth at Section 164(e)(2)(A)-(D). ALJ's Oct. 29, 2001 Dec. and Ord. at 20. In remanding the case, the Board directed the ALJ to take "into account his findings concerning the JTPA requirements for recipients and subrecipients for the pertinent time periods" as well as the "substantial compliance" requirement of Section 164(e)(2). ARB Dec. of Rem. at 7.

On remand, the ALJ again concluded that Massachusetts was not eligible for a waiver of liability. S.D.O.R. at 15-21. The ALJ found that Massachusetts had not established that it complied with three of the four recipient obligations at Section 164(e)(2)(A)-(D). S.D.O.R. at 18-20. In addition, the ALJ determined that Massachusetts's failure to establish substantial compliance with those three obligations supported a finding that waiver was precluded under Section 164(e)(1). The ALJ specifically found, under Section 164(e)(2)(A),(C) and (D), that Massachusetts had failed to follow its own published policies in monitoring its contracts with the Lynn SDA, had failed to act with due diligence in carrying out the appropriate monitoring activities, and had failed to take prompt and appropriate action when it received indications that Lynn was violating the JTPA. S.D.O.R. at 18-20. The ALJ further found that Massachusetts's failures to fulfill these three recipient obligations established a failure to observe accepted standards of administration, one of the aggravating factors that precludes eligibility for waiver under Section 164(e)(1). *Id.* at 20-21.

For the reasons that follow, we concur in the ALJ's findings under Section 164(e)(2)(A), (C) and (D). We examine the ALJ's findings under each of these three recipient obligations that are set forth at Section 164(e)(2) in turn.

## B. Section 164(e)(2)(A)

The ALJ found that the evidence did not establish that Massachusetts had substantially complied with the Subsection (A) requirement "to establish and adhere to an appropriate system for the award and monitoring of contracts with subgrantees which contains acceptable standards for ensuring accountability." 29 U.S.C.A. § 1574(e)(2)(A) (quoted *supra* at Part I.B.2.). He reached that conclusion based on his finding that, although Massachusetts had established an appropriate system for the awarding and monitoring of contracts, it had failed to adhere to that system. S.D.O.R. at 17-18. The ALJ found that, in particular, Massachusetts had failed to adhere to two of its policy directives, Policy Directive (PD) 93-12 and PD 94-07.

PD 93-12 set standards for the State's monitoring of subrecipient fiscal systems, including a four-tier rating system that ranges from "certified" to "decertified." GX 2 at pp. 540-88. If an SDA is decertified, the SDA job training plan may be revoked and a reorganization plan, which may include designation of a new administrative entity, may be imposed. *Id.* at p. 543. PD 94-07 required Massachusetts SDAs to conduct annual audits of JTPA funds and described the State's oversight role in ensuring that the audits were conducted and that audit findings were timely resolved. GX 2 at pp. 655-718.

The ALJ interpreted PD 93-12 as requiring the State to designate an SDA's fiscal system as "out of compliance" within a specific timeframe after the State had downgraded the SDA system to "certified with conditions." S.D.O.R. at 16-18; *see* GX 2 at pp. 542-43. David Manning of the Massachusetts Department of Employment and Training (DET) testified that the State expected an SDA to correct fiscal system deficiencies by the next annual assessment. HT 417-19, 423-26 (Manning). Massachusetts downgraded the Lynn SDA fiscal system to certified with conditions no later than October 1993, and that fiscal system continued to decline over the next few years. GX 2 at p. 1231; HT 419-20, 424-25 (Manning), 465-71 (Sweeney). The ALJ therefore reasoned that PD 93-12 required the State to further downgrade the SDA approximately one year after it was initially certified with conditions, when the next formal evaluation of the SDA's fiscal system would have been due. S.D.O.R. at 18; ALJ's Oct. 29, 2001 Dec. and Ord. at 20-21; *see* HT 424 (Manning).

Massachusetts did not take such action in October 1994, however. Instead, Massachusetts continued to rate the Lynn SDA's fiscal system as "certified with conditions" until the Northshore fiscal system was decertified only a few months before the June 1996 closure of that facility. As the ALJ found, Massachusetts again conditionally certified the SDA in September 1994, despite numerous deficiencies that CBWL/ISP had identified. GX 2 at p. 1147. Those deficiencies include the inadequacy of Northshore's fiscal system to generate a report on the SDA's actual assets, the lack of an acceptable methodology to allocate costs, and Northshore's failure to reconcile its bank statements for an eighteen-month period, which left it many months behind in performing those reconciliations. GX 2 at pp. 1148-53. In February 1995, the CBWL/ISP notified Northshore that the SDA had made "inadequate measurable progress" in remedying its fiscal system deficiencies. GX 2 at p. 1161; *see id.* at pp. 1163-68. CBWL/ISP cautioned Northshore that it was in jeopardy of being designated as a "high-risk" JTPA subrecipient and placed under the funding restrictions provided by 20 C.F.R. § 627.423. *Id.* at 1161. In March 1995, the Massachusetts Executive Office of Economic Affairs (EOEA) advised Northshore of its concerns regarding deficiencies in Northshore financial records and internal controls. GX 2 at p. 1235. That letter cautioned Northshore that failure to respond to EOEA's requests for information would result in designation as a "high-risk" JTPA subrecipient. *Id.* at 1241. In May 1995, CBWL/ISP took over direct responsibility for the administration of some Title III programs. GX 2 at p. 1172; HT 320-31 (Durkin).

In April 1996, DET advised Northshore that it had found the SDA's fiscal system to be "not operational or coherent" and thus not certifiable under the State's guidelines.

GX 1 at pp. 190-91. In June 1996, the Northshore facility was closed and the Greater Lowell Regional Employment Board assumed responsibility for Southern Essex SDA programs. GX 1 at pp. 33, 172; GX 3 at pp. 4-5; *see* HT 320-31 (Durkin). The Grant Officer testified that he believed earlier decertification of the Northshore fiscal system would have prevented many of the misexpenditures for FYs 1995 and 1996. HT 157-58 (Salgado).

We agree with the ALJ's interpretation of PD 93-12. The ALJ's conclusion that PD 93-12 required Massachusetts to downgrade Northshore's fiscal system within a year after initially cautioning Northshore regarding serious deficiencies is supported by the evidence, including Manning's testimony. Although PD 93-12 states that the timetables for corrective action would be established on a case by case basis, Manning testified that the State would typically downgrade an SDA's fiscal system if improvements were not shown by the State's next formal monitoring visit. HT 423-25 (Manning); *see* GX 2 at p. 543. As the ALJ found, not only was the Northshore fiscal system not downgraded in the fall of 1994, it was not downgraded until only a few months before the Northshore facility was closed in June 1996. In view of the increasing fiscal control deficiencies that Massachusetts oversight agencies identified at Northshore throughout 1994 and 1995, the ALJ properly concluded that Massachusetts failed to establish that it had adhered to PD 93-12 in addressing those deficiencies.

We also agree with the ALJ that Massachusetts failed to follow the mandates of PD 94-07. As the ALJ found, PD 94-07 required SDAs to conduct the annual SAA audits that are required of JTPA grantees. GX 2 at pp. 655-56. PD 94-07 also required the State to begin action to resolve audit findings within 180 days of receipt of such findings. *Id.* The Lynn SDA did not conduct the required audits for FYs 1995 and 1996. *See* S.D.O.R. at 10. As the ALJ determined, in early 1994, Massachusetts had not yet resolved audit findings with the Lynn SDA from FY 1992.[32] S.D.O.R. at 19; *see* GX 2 at p. 1153. It is also noteworthy that the evidence indicates that those unresolved findings "were repeated from the FY91 Audit." GX 2 at p. 1153. The ALJ thus determined that Massachusetts had not established substantial compliance with Section 164(e)(2)(A).

Massachusetts challenges the ALJ's application of Subsection (A) of Section 164(e)(2) as requiring the State to demonstrate anything beyond the *establishment* of a system for awarding and monitoring contracts. Massachusetts argues that, since the ALJ found that Massachusetts had established a system for the awarding and monitoring of contracts with subgrantees, the ALJ improperly concluded that Massachusetts failed to establish compliance with Subsection (A). Mass. Oct. 13, 2004 brief at 20-21. We reject this contention. The language of the statute is clear. Subsection (A) requires the recipient to demonstrate that it substantially complied with the obligation "to establish *and adhere to* an appropriate system" for awarding and monitoring contracts with

---

[32]    In the interest of clarity, we note that the FY 1992 audit findings concerned the period of operation from July 1, 1991–June 30, 1992. *See* n.9 *supra.*

subgrantees. 29 U.S.C.A. § 164(e)(2)(A) (emphasis added). The ALJ thus properly considered whether Massachusetts had complied with the system it established, including following the mandates of PD 93-12 and PD 94-07.

Thus, the ALJ correctly concluded that Massachusetts did not establish substantial compliance with the Subsection (A) obligation "to establish and adhere to an appropriate system for the award and monitoring of contracts with subgrantees which contains acceptable standards for ensuring accountability." 29 U.S.C.A. § 1574(e)(2)(A).

### C. Section 164(e)(2)(C), (D)

The ALJ also found that the evidence did not establish that Massachusetts had substantially complied with the Subsection (C) obligation that it act "with due diligence to monitor the implementation of the subgrantee contract, including the carrying out of the appropriate monitoring activities (including audits) at reasonable intervals." 29 U.S.C.A. § 1574(e)(2)(C) (quoted *supra* at Part I.B.2.). S.D.O.R. at 19-20. In addition, the ALJ found that Massachusetts had not demonstrated substantial compliance with the Subsection (D) requirement that it take "prompt and appropriate corrective action upon becoming aware of any evidence of a violation of this Act or the regulations under this Act by such subgrantee." 29 U.S.C.A. § 1574(e)(2)(D) (quoted *supra* at Part I.B.2.). The evidence in this case regarding Massachusetts's compliance with the Subsection (C) monitoring obligation is closely related to the evidence regarding the State's obligation to take prompt corrective action under Subsection (D). *See* S.D.O.R. at 19-20. Simply put, the relevant evidence concerns how Massachusetts monitored Northshore's fiscal controls, including compliance with its annual audit requirement, and how Massachusetts responded when it became aware of deficiencies in these aspects of Northshore's operation. The record provides evidence of instances in which Massachusetts, after identifying deficiencies, continued to monitor Northshore's fiscal controls without promptly taking appropriate corrective action. *See* S.D.O.R. at 19-20. We will examine the ALJ's findings regarding Subsections (C) and (D) jointly.

Relevant to the Subsection (C) requirement that the recipient diligently monitor the subrecipient's compliance with its audit obligations, the ALJ identified two instances of Massachusetts failing to timely resolve outstanding audit findings. First, he cited the CBWL/ISP identification of audit findings from Lynn's FY 1992 audit that the State had not yet resolved as of September 1994. S.D.O.R. at 19; *see* GX 2 at p. 1153. In addition, the ALJ cited the report for the FY 1996 independent audit of Massachusetts federal financial assistance programs, which stated that questioned costs of $202,397 from the Lynn FY 1994 audit had not been resolved, as of June 30, 1996. S.D.O.R. at 19; *see* GX 1 at p. 48. Reiterating that Lynn did not conduct independent audits for FYs 1995 and 1996, the ALJ noted the requirements for an annual audit that Massachusetts PD 94-07 imposed on Lynn, which were essentially identical to those that the JTPA and the SAA imposed. S.D.O.R. at 20; *see* GX 2 at pp. 662-63, 665. The ALJ properly concluded that the foregoing evidence does not support Massachusetts's burden to establish that it had diligently monitored Lynn's compliance with its audit obligations, as required by Subsection (C).

As the ALJ further found, the foregoing evidence is corroborated by the independent auditor's findings regarding the approach of the EOEA, the State's chief JTPA oversight agency, to ensuring compliance with SAA audit requirements. S.D.O.R. at 19. The auditor found that EOEA monitoring of the subrecipient Lynn needed improvement. GX 1 at p. 46. The auditor specifically recommended that EOEA modify its procedures to incorporate a requirement that "corrective action . . . be taken on all findings within six months after receipt of an audit report" and that subrecipients provide the EOEA with a copy of the audit report within thirty days after issuance to comply with the Circular A-128.[33] *Id.; see* 29 C.F.R. Pt. 96, App. A.; discussion *supra* at Part I.B.1.

Relevant to the Subsection (D) requirement that the recipient take prompt, appropriate corrective action, the ALJ recounted the State's delay, between October 1993 and April 1996, in downgrading the Lynn SDA's fiscal control system from certified with conditions to decertified. S.D.O.R. at 19; *see* discussion *supra* regarding Section 164(e)(2)(A). The ALJ noted that unresolved FY 1992 audit findings played a role in Massachusetts's October 1993 decision to downgrade the SDA's fiscal system to conditionally certified. S.D.O.R. at 20; *see* GX 2 at p. 1153. Citing the OMB Circular A-128 requirement, as well as that of Massachusetts's PD 94-07, that audit findings be resolved within six months, the ALJ concluded that the State failed to act promptly in addressing the Lynn fiscal system deficiencies. S.D.O.R. at 20. The ALJ properly concluded that the foregoing evidence does not support Massachusetts's burden under Subsection (D) to establish substantial compliance with its obligation to take prompt and corrective action upon becoming aware of any evidence of a violation of this Act or the regulations.

Massachusetts challenges the ALJ's reliance on the independent auditor's finding that Lynn had failed to successfully implement a corrective action plan to address "material questioned costs" that were identified in Lynn's FY 1994 audit. Mass. Oct. 13, 2004 brief at 22-23; *see* S.D.O.R. at 19; GX 1 at p.48. The ALJ similarly relied on evidence in the state auditor's report regarding the special scope review of Northshore operations that the state auditor conducted for FYs 1995 and 1996. S.D.O.R. at 19-20; *see* GX 1 at pp. 161-85. The state auditor found, based on review of reports that State JTPA oversight agencies had prepared, that Northshore had repeatedly failed to implement effective actions to ensure proper control of its finances. S.D.O.R. at 19-20; GX 2 at pp. 171-72. We find that this evidence addresses Lynn's failure to successfully implement corrective action plans but is not probative evidence of Massachusetts's compliance with its obligation to take prompt corrective action under Subsection (D).

---

[33]    OMB Circular A-128 expressly requires that a recipient ensure that appropriate corrective action is taken within six months of receipt of a subrecipient's audit report and that subrecipients provide audit reports within 30 days of receipt. 29 C.F.R. Pt. 96, App. A., ¶¶ 9.c., 13.f.

Neither the state auditor's report nor the independent auditor's report links Northshore's failure to implement these plans to omissions on Massachusetts's part. *See* GX 1 at p. 48; GX 2 at pp. 171-72. As Massachusetts points out, the independent auditor's finding is captioned, "Subrecipient Single Audit Monitoring Needs Improvement." GX 1 at p. 48. However, the auditor's finding, when read in context, does not support the inference that Lynn was unable to implement the corrective action plans because of Massachusetts's failure to act promptly. GX 1 at p. 48.[34] Section 164(e)(2) permits waivers of liability for recipients when the misexpenditure of funds occurred at the subrecipient level. 29 U.S.C.A. § 1574(e)(2). It is therefore critical that we carefully distinguish between evidence that establishes a subrecipient's non-compliance with the Act and regulations and evidence that establishes such non-compliance on the part of the recipient. Furthermore, and as we have discussed, the ALJ properly relied on the much more definite evidence in the record regarding whether Massachusetts fulfilled its oversight obligations in addressing the deficiencies in the Northshore operation between October 1993 and the Northshore closure in June 1996. Consequently, his error in relying on these findings by the state auditor and the independent auditor is harmless.

We do not accept Massachusetts's contention that statements in the original Grant Officer's Final Determination are relevant to the Section 164(e) waiver of liability issue. Massachusetts urges that a statement that was included in the Grant Officer's Final

---

[34]   The pertinent passage in the EOEA audit report reads:

> Upon review of the 1994 audit report of the sub-recipient discussed above, the [Grants Management] Unit . . . noted material questioned costs. The Unit worked with the subrecipient to develop and implement a corrective action plan to remedy the cause of the questioned costs and other findings. However, the subrecipient did not successfully implement the plan. Accordingly, the Unit increased the frequency and duration of the monitoring of the subrecipient in an effort to continue to provide uninterrupted service to the program's clients. During this intensive monitoring, the Unit determined that the subrecipient did not have the ability to operate the program within the regulations established by the Job Training Partnership Act and OMB Circular 128. At that time, the subrecipient was de-certified and the program was transferred to another subrecipient. Throughout this process, the Unit and [EOEA] have been in contact with the US Department of Labor (DOL) to alert DOL to the issues regarding the subrecipient.

GX 1 at p. 48.

Determination that was issued May 13, 1998, supports a finding that the State acted with due diligence to fulfill its recipient obligations within the meaning of Section 164(e)(2). Mass. Oct. 13, 2004 brief at 23-24. The statements appear to commend Massachusetts for having taken corrective action "in bringing to light and terminating subgrantee misexpenditures that constituted wil[l]ful disregard of the requirements established at Section 164(e)(1)." GX 1 at p. 12.[35] As the ALJ observed in his initial decision, the passage is enclosed in quotation marks and follows a block quotation from a document that Massachusetts filed with the Grant Officer to characterize its position regarding the disallowed costs. The format in which the quoted text is presented thus raises a question regarding the source of the text. ALJ's Oct. 29, 2001 Dec. and Ord. at 8.

Assuming, for the purposes of this decision, that the statements represent the conclusions of the Grant Officer who was assigned to the case at that time, such conclusions are not binding on either the ALJ or this Board. *See* 20 C.F.R. §§ 627.801, 627.802(e). Furthermore, inasmuch as the question of Massachusetts's eligibility for a waiver pursuant to Section 164(e) of the Act was not before the Grant Officer at that time, it is also unlikely that the Grant Officer intended the statements to be considered legally significant. *See* HT 217-18 (Salgado, testifying that the waiver issue was not before the Grant Officer to whom the case was originally assigned); ALJ's Oct. 29, 2001 Dec. and Ord. at 8 (summarizing ALJ's order of Apr. 14, 1999 remanding case to Grant Officer to afford Massachusetts an opportunity to offer additional documentation regarding its eligibility for waiver and other issues).

We therefore agree with the ALJ that Massachusetts failed to establish substantial compliance with its recipient obligations under Subsections (C) and (D).

---

[35]    The statements, which are enclosed in quotation marks, read as follows:

> The audit and the corrective action record establish that the State recipient took appropriate and diligent action, as set out [at] Section 164(e)(2) and 164 (b)(1) of the JTPA, in bringing to light and terminating subgrantee misexpenditures that constituted wil[l]ful disregard of the requirements established at Section 164(e)(1) of the JTPA. The State has also complied with the applicable audit coverage, resolution and debt collection requirements set out at 20 cfr 627.480, and 481. In spite of its efforts, the State has not been able to obtain repayment from the subrecipient or secure its cooperation in a resolution process that could reduce the debt to the State.

GX 1 at p. 12.

## D. Conclusion

To establish eligibility for a waiver of liability for repayment of disallowed funds, Section 164(e)(2) requires the State to establish substantial compliance with all four recipient obligations listed at Subsections (A) – (D). 29 U.S.C.A. § 1574(e)(2); 20 C.F.R. 627.704 (quoted *supra* at Part I.B.2.). In view of our affirmance of the ALJ's findings under Subsections (A), (C) and (D), we need not address his finding that Massachusetts established substantial compliance with Subsection (B), S.D.O.R. at 18-19. Furthermore, in view of our determination that Massachusetts has failed to establish eligibility pursuant to Section 164(e)(2), it is unnecessary for us to address the ALJ's further finding that a waiver of liability was precluded pursuant to Section 164(e)(1), S.D.O.R. at 20-21.

<div align="center">CONCLUSION</div>

This record and relevant law support the ALJ's determination that the Commonwealth of Massachusetts failed to establish a basis for overturning the Grant Officer's November 8, 1999 disallowance of costs under Titles II and III for Massachusetts FY 1995 and 1996. The evidence and relevant law also support the ALJ's determination that the Commonwealth of Massachusetts is not eligible for a waiver of liability for repayment of the disallowed costs. Based on the Grant Officer's concession regarding $182,605 in Title III costs, we reverse the ALJ's findings regarding those costs, and therefore modify the amount that Massachusetts is ordered to pay to $8,925,381. Massachusetts is accordingly ordered to pay that amount to the U.S. Department of Labor in non-federal funds. *See* 29 U.S.C.A. § 1574((e)(1).

**SO ORDERED.**

> **WAYNE C. BEYER**
> **Administrative Appeals Judge**
>
>
> **OLIVER M. TRANSUE**
> **Administrative Appeals Judge**